46 So.2d 525 (1950)
BORDENAVE
v.
TEXAS & NEW ORLEANS R. CO.
No. 19368.
Court of Appeal of Louisiana, Orleans.
May 15, 1950.
William J. Guste, Leopold Stahl, John Pat Little and James M. Colomb, Jr., New Orleans, for appellant.
Chaffe, McCall, Toler & Phillips, New Orleans, for appellee.
*526 REGAN, Judge.
Plaintiff, Mrs. Marguerite R. Bordenave, a passenger in an automobile owned and operated at the time of the accident, by Walter Johnson, brought this suit in the amount of $39,769.38, as damages for personal injuries sustained by plaintiff by virtue of a collision between Johnson's automobile and one of the trains of the defendant, Texas & New Orleans Railroad Company.
Defendant answered and denied that it was guilty of any negligence in the premises and that the "sole proximate cause of the accident" was the gross negligence of Johnson, the driver of the automobile, "in crossing the tracks in disregard of defendant's train", and, in the alternative, defendant pleaded contributory negligence.
Plaintiff's suit was consolidated with that of Walter Johnson, by the Judge, a quo, and, after a trial on the merits, there was judgment in favor of defendant, dismissing the suits of plaintiff and Johnson. From that judgment plaintiff alone has prosecuted this appeal.
The record reveals that the accident occurred on October 17, 1946, a clear, cool, dark night, between 10:15 and 10:25 p. m., at which time plaintiff was seated in the right front seat of Johnson's 1939 Chevrolet automobile, which was, immediately preceding the accident, being driven along the riverroad in the vicinity of Southport, toward the City of New Orleans. Their route into the City was by way of Oak Street, which, incidentally, was the same route they had followed out of the City some hours before. Plaintiff and Johnson both knew that this route necessitated the crossing of a number of railroad tracks. These tracks, being six in number, intersected Oak Street, in which plaintiff and Johnson were proceeding at an angle of about forty degrees, the obtuse angle being on the right of a motorist approaching the City; simultaneously, defendant's yard engine, moving backward and pulling three pullman cars and a caboose, was approaching Oak Street at a speed of between twelve and fifteen miles per hour, (maximum permissible speed on this section of tracks, 25 miles per hour) on the Public Belt Railroad tracks which parallel the levee. The automobile came to a stop a short distance from the first track and thereafter proceeded slowly across the tracks intersecting Oak Street at Leake Avenue, it was then struck by defendant's engine on the fourth track and was pushed or dragged a distance estimated from sixty to one hundred feet. The only mechanical warning device was a small blinker light, which intermittently flashed red with considerable rapidity, and it was located on the telephone pole near the street light and it was clearly visible to vehicular and pedestrian traffic.
Plaintiff, whose testimony was taken before a Notary Public, stated that realizing Johnson had to cross the railroad tracks, she looked for warning signs, but observed none; that the automobile was brought to a complete stop, before proceeding upon the tracks, at which time, her vision being excellent, she could see down the tracks; she looked in all directions "left and right, and right in front of me"; she did not observe the defendant's train approaching; she saw no lights from the train, nor did she listen for the approach of a train; and that her hearing was excellent, but she heard no whistle or bell emanating from defendant's engine. Plaintiff's version of the accident is substantially corroborated by Johnson, who maintained, as did plaintiff, that they were unaware of defendant's train until after the collision had occurred.
There is evidence in the record to the effect that there are two advance warning signs placed by the Highway Department on each side of the street, well in advance of the crossing and "cross buck or cross arm railroad crossing signs nearer the tracks", and "a small" red "blinker light located on the telephone post on the righthand side of the crossing just in advance of the first track"; and that a motorist, who approached these tracks, coming from the Parish of Jefferson, as Johnson and the plaintiff did on this occasion, would first observe that their view of the tracks to the right was obstructed by a building known as Bensel's Garage, which is situated about twelve feet to the right of the road and eight feet from the first rail of *527 the first track, but upon reaching a point where their bumper was about six feet from the first rail of the first track, they would have an unlimited and unobstructed view to their right down the tracks which intersect Oak Street.
Defendant's employees in command of the train on the night of the accident, substantially corroborate each other. However, there was only one person who testified that he actually saw the accident and that was defendant's engineer, Harley G. McCall. McCall testified that the train was approaching the crossing, at Oak Street, not over fifteen miles per hour, with the engine's headlight burning; the regular crossing whistle was blown as the engine approached the Oak Street intersection; the bell was ringing automatically and an alarm whistle was given just before the accident; that the automobile was first observed by him as it emerged from behind Bensel's Garage and it was then about seventy-two feet away from the track upon which the engine was proceeding; at which time and until the car had traversed about one-half the distance to the tracks upon which the engine was moving, the engineer continued to assume that the car which had increased its speed, would stop before proceeding into the path of the train; defendant's engine was approximately one hundred and ten feet from Oak Street when the automobile was first observed and about thirty feet when the engineer realized that the car would not stop, at which moment he set his alarm whistle and applied his emergency brakes; thereafter the automobile continued into the path of the train which, in turn, struck the automobile and pushed or dragged it about seventy to one hundred feet and, at this point the engine came to a complete stop.
As stated heretofore, only one person testified that he actually saw the accident and that was defendant's engineer, McCall. The testimony of plaintiff, and of the operator of the automobile is essentially negative in character. Plaintiff stated that she never saw the train. Johnson testified to the same effect that he did not see the approaching train. Therefore, the record reflects no serious factual conflict relative to the manner in which the collision occurred.
E. B. Wyman, employed by the Texas and Pacific Railroad Company as claim agent, testified that he was visiting the Southport Club on the night of the accident and had just emerged from the Club when the accident occurred. He stated that the Club was about one and one-half blocks from the crossing at Oak Street, the situs of the accident; he heard the engine whistle several times before reaching the crossing and heard it blow a series of alarm blasts, "short, quick blasts of the whistle"; he saw the engine's headlight coming towards him or "coming towards Oak Street", and "just after the alarm blast I heard a thud, an impact of hitting something * * * I hastened down to Oak Street" and found "the engine was in backup position", the head end of the locomotive (rear in point of movement) on the north or left edge of Oak Street with its rear headlight (front in point of movement) burning, the street light on the right of the road burning, the red blinker light flashing and the automobile about seventy to seventy-five feet north of Oak Street with its head and taillights burning, and that "all the windows on the car were closed. The right front windshield glass was broken, but all other windows were closed".
Plaintiff contends that:
"1. That plaintiff, a guest passenger was free from any negligence;
"2. That defendant was negligent when its Engineer did not apply his brakes as soon as he saw the automobile;
"3. That defendant was negligent in operating its train over this crossing without automatic signal;
"4. That defendant was negligent in that the Engineer did not approach the crossing with caution prepared to stop, as he was required to do under the safety regulations governing his operation of the train."
In connection with the contention designated above as "3" plaintiff introduced in evidence a certified copy of Ordinance No. *528 14,114 CCS, City of New Orleans, which she specifically pleaded. Section 2 of that ordinance requires that "* * * every railroad company operating within the city limits of the City of New Orleans shall, at all points where its rail or rights-of-way cross or intersect a paved street situated in said city limits provide and maintain automatic signal lights of an approved design, which shall be kept in constant operation at all times".
In connection with the contention designated as "4" plaintiff refers us to a document labeled "Safety First, New Orleans Public Belt Railroad of the City of New Orleans, Employee's Time Table No. 13, effective August 1, 1946", which was introduced in evidence. One half of the document is taken up with special instructions and the first paragraph thereof sets forth the employees subject thereto, including those of the defendant. The last paragraph of the document, under the section heading "Railroad Grade Crossings" reads as follows: "All trains, yard cuts and/or engines must approach all highway and street crossings at grade with caution prepared to stop, crossing whistle sounded and bell ringing until engine passes over crossing."
Defendant, on the other hand, maintains the following:
"1. Defendant was free from any negligence causing, contributing to or connected with the accident.
"2. The sole proximate cause of the accident was the gross negligence of the driver of the automobile in which plaintiff was riding in crossing the tracks in disregard of defendant's train.
"3. Even if defendant was guilty of negligence proximately causing the accident, plaintiff was guilty of contributory negligence barring her recovery."
It is obvious that the first question posed by virtue of the facts adduced and the pleadings filed herein is whether the defendant was guilty of any negligence in connection with the accident?
The evidence reveals that, as the train approached Oak Street, it was in charge of a competent crew, its braking system was functioning properly, the train was being operated at a speed of fifteen miles per hour, the headlight brilliantly illuminated the track ahead, the engine bell was ringing continuously by automatic control, and the conventional crossing whistle (consisting of two long blasts, a short blast and a long blast) was blown. Its approach to the crossing was thus both visible and audible.
Both the engineer and the fireman were in their respective seats maintaining a continuous and attentive lookout ahead. When the engine was approximately one hundred and ten feet away from the Oak Street crossing, the engineer (from whose side it approached) observed the automobile in which plaintiff was riding as it cleared Bensel's Garage. The automobile being then seventy-two feet away from the track on which the train was proceeding and there being nothing unusual or alarming in the driver's actionsboth plaintiff and the driver testified that the car was brought to a complete stop at this pointthe engineer assumed that he would behave in a normal, rational manner and heed the warning signals and the locomotive itself so as not to proceed in its path. Continuing to observe the automobile, defendant's engineer still assumed, as he was justified in doing, that it would stop short of the track on which the train was movingas it could have; the reasonableness of this supposition is borne out by plaintiff's and the driver's testimony that the automobile started very slowly, in first gear. Still continuing to observe the automobile, which had at first increased its speed while still several tracks away, then had slowed down again, defendant's engineer saw the car accelerate again and, when the engine was slightly more than thirty feet from the street crossing, immediately realized that he could no longer count on its stopping; whereupon he immediately gave an alarm signal on the engine's whistle and set the brakes in emergency, thus doing everything in his power to avert the collision which would occur if the automobile did not stop. The engine came to a stop approximately seventy to one hundred feet beyond the crossing, having covered a distance of one hundred and twenty to one hundred and fifty feet in *529 stopping which, according to the testimony of an expert, constituted an excellent stop under the conditions. Clearly these actions of defendant's engineer constituted the performance of everything that he could reasonably be expected to do to avert the accident.
The jurisprudence in Louisiana is to the effect that those in charge of a railroad train may presume that an individual or vehicle approaching a crossing will stop in time to avert an accident and that, consequently, there is no negligence in their failure to anticipate that this will not be done. This rule recognizes the practical fact that many pedestrians and motorists approach the nearest point at which they can stop with safety before halting to permit a train to pass; it also incorporates the practical rule that it would not be possible to operate trains on time or even on a reasonable schedule if they were required to stop or to prepare to stop each time an individual or vehicle was seen to approach a crossing.
Recently, in Matthews v. New Orleans Terminal Co., La.App., 45 So.2d 547, 553, wherein the plaintiff sought to recover damages for injuries sustained when his automobile was struck by the defendant's train, the contention was made that the locomotive was not timely stopped. We reviewed the testimony, which was that the operator of the locomotive saw the automobile
"* * * approaching at about thirty miles an hour, at a considerable distance away from the tracks, when the locomotive had reached * * * about 230 feet from the point of impact, and that he expected the automobile to stop before going upon the tracks.
"When the train was at about the middle of the neutral ground, some sixty feet from the crossing, Flores then realized that the automobile was not going to stop, and he immediately applied the emergency brake, but the stopping distance was too limited, and the collision ensued. Flores stated that when an automobile is observed approaching the tracks, an engineer cannot determine whether the driver will stop for the crossing, until the car has reached close proximity to the tracks and the driver's intention becomes manifest."
In resolving the question of whether the expectation that the car would stop constituted negligence on the part of the railroad, we pointed out that "it is a well-known fact that an automobile can be stopped more quickly than a train * * *".
It thus appears that our jurisprudence is well settled that where the crewmen in charge of a train see an automobile approaching the tracks on which the train is operating, they are not negligent in assuming that it will stop unless such assumption is unreasonable under the circumstances. It necessarily follows that if they persist in this belief and this belief continues to be reasonable until it is no longer in their power to avoid the accident, there is no negligence on their part and no liability attaches to the railroad company.
In Barnes v. T. & N. O. Railroad Company, La.App.1943, 16 So.2d 600, 602, certiorari denied 1944, the decedent was standing between the rails of the track adjoining that on which the train was operating and suddenly turned and attempted to dash across the main line track: "The fireman, at his post in the locomotive of the train, testifies that he first saw Jennie Wallace standing between the rails of the passing track when the train was about a half mile from her position; that she continued to stand at this point until the locomotive was about 300 feet away, at which time she turned and attempted to dash across the main line track. He testifies that he cried out to her and signaled to the engineer, who made an emergency stop, bringing the train, which was traveling at a speed of about thirty miles an hour, to a stop some twenty car lengths south of the point of impact".
The court expressed the opinion that the plaintiffs could only hope to recover by bringing the facts of the case within the doctrine of last clear chance or discovered peril: "In order to justify the application of the discovered peril theory in this case, it would be necessary to definitely establish the fact that, perceiving the actual peril, *530 the members of the train crew failed to exercise every possible means at their command to avoid injury to the person in peril. This necessitates the establishment as a corollary proposition that the danger was discovered in time for precautionary measures to be taken. In our opinion neither of these predicates is satisfactorily established by the facts in this case."
The court concluded that the deceased undoubtedly heard and saw the approach of the train and referred to the jurisprudence that such contributory negligence, even though continuing down to the moment of the accident, did not absolve the defendant of liability if the peril was actually or should have been discovered by it. It emphasized that the defendant was charged with the duty of saving the person in danger even from the consequences of his own negligence and went on to say: "But, it is also true that a defendant is not liable in those cases where accident could not be avoided after the existing peril was, or should have been, discovered. * * * There is nothing in the case before us which, even in the slightest degree, would indicate anything in the action, appearance or position of Jennie Wallace which would serve to warn the members of the train crew that she was in danger."
The court pointed out that it would be thoroughly unreasonable to require the train crew to bring the train to a stop to avoid an accident which could only be contemplated as possible and not as imminent.
That the speed of the engine in the instant case was not faster than the permitted rate, but on the contrary was reasonable and proper, is clearly established by the testimony of the engineer, McCall, the fireman, Brechtel and the switch foreman, Heitmeier. They all testified that the speed of the train was between twelve and fifteen miles per hour.
According to the Public Bell Time Table, the maximum permissible speed was twenty-five miles per hour so that, in the absence of special circumstances, the speed of the train was manifestly proper.
It is no less evident from the testimony of the various witnesses that the engine was being properly operated and was under full control.
The testimony is clear and uncontroverted that the engine headlight was burning in the direction in which the train was moving.
Although it appears that the engine was being properly operated, plaintiff contends that there was a failure to comply with the Public Bell Time Table requirement that: "All trains, yard cuts and/or engines must approach a highway or street crossing at grade with caution prepared to stop, crossing whistle sounded and bell ringing until engine passes over crossing."
This contention is based apparently on plaintiff's interpretation of this rule as requiring trains and engines to be so operated that they can be brought instantly to a stop at a crossing at any time, no matter how short the notice or how sudden the emergency. In our opinion the intent of this rule is merely that trains and engines anticipate the necessity of stopping for a blocked crossing, in contradistinction to trains and engines operating on main lines which may and must operate in the expectation that crossings will be open, and that this train was prepared to stop.
Here defendant's train did approach the crossing with caution and its speed of fifteen miles per hour was consistent with its being prepared to stop if the crossing should not have been free of obstacles. It will be recalled that the stop was actually made in a distance of approximately one hundred twenty feet to one hundred fifty feet, a distance well within the limit of the headlight's illumination.
The testimony is also clear that defendant's employees in charge of the train were maintaining a proper lookout and exercised reasonable care, including the giving of warning signals, to avoid striking the automobile in which the plaintiff was a passenger.
It will be noted that the plaintiff and the driver of the automobile, Johnson, did not testify that no whistle was blown and no bell rung, but merely that they did not hear any warning signal. The rule is well established that negative testimony of *531 this sort will not prevail against positive testimony to the contrary. See 32 C. J. S., Evidence, § 1037(c), p 1084; Natal v. L. & A. Ry. Co. 1931, 18 La.App. 50, 137 So. 600; Helman v. Pan American Life Ins. Co., 1935, 1936, 183 La. 1045, 165 So. 195; Hutchinson v. T. & N. O. R. Co. La.App. 1947, 33 So.2d 139, 142.
It will be observed that there was no lack of adequate warning signs and signals. The occupants of an automobile approaching the trains as plaintiff's vehicle was would first have their attention called to the presence of the railroad tracks by the highway warning signs on both sides of the road. Next they would be warned by the large wooden crossbuck signs on both sides of the highway approximately ten feet from the nearest rail of the first track. Finally, they would be warned by the continuous blinker light called for by City Ordinance No. 14,114 CCS on the telephone pole next to the crossbuck sign, which red light, flashing on and off, could not possibly be interpreted as anything other than a warning to be careful.
Plaintiff also contends that defendant failed to protect the crossing in the manner required by New Orleans City Ordinance No. 14,114 CCS dated 20 June 1934, Section 2 of which reads as follows: "Section 2. Be It Further Ordained, Etc., that every railroad company operating within the city limits of the City of New Orleans shall at all points where its rails or right-of-way cross or intersect a paved street situated in said city limits provide and maintain automatic signal lights of an approved design, which shall be kept in constant operation at all times, provided at crossings where watchmen are stationed continuously by any such railroad company, it shall not be necessary to provide such automatic signal lights." (Italics ours.)
The ordinance requires the provision and maintenance of "automatic signal lights of an approved design" and their constant operation. Precisely what constitutes "an approved design" does not appear from the language used in the ordinance.
Pretermitting the question of whether the light was proper to afford plaintiff help, the failure on defendant's part to comply with municipal ordinances relative to crossing protection (such as having a light which flashed only at the approach of a train as defendant contended) would have to be accompanied by a showing that plaintiff and the driver would have done more to insure their safety than they actually did. Here, both plaintiff and the driver testified that the car was stopped and that they looked for a train; can it logically be said that with a different type of signal they would have done more than they did? Would they not still have stopped and looked for a train? And having actually failed to hear the whistle and bell signals or to see the brilliant headlight, can we assume that any type of signal light would have averted this accident? We think not.
We recently observed that, even if the lights provided at the crossing were not entirely in compliance with the requirements of the ordinance, such noncompliance would not dispense with the necessity of the exercise of care by drivers and occupants of vehicles approaching the crossing. In Matthews v. N. O. Terminal, supra, the plaintiff contended that the defendant's flasher-light signals were not operating at the time of the accident in which his automobile was struck by defendant's train. We concluded in that case: "No useful purpose whatever would be served by resolving the question whether the crossing signal lights were properly operated, or for that matter if they operated at all. However, assuming arguendo that the lights were not flashing, such fact of itself would not relieve plaintiff of the duty imposed upon him by law to stop, look, and listen for approaching trains, and by the exercise of prudence and vigilance to avoid placing himself in a position of imminent peril." [45 So.2d 551]
We reviewed the plaintiff's testimony as to his having stopped, looked and listened and concluded that there was no perceptible reason why he should not, by the exercise of his senses of sight and hearing, have become cognizant of the approaching train. We pointed out that one approaching a railroad crossing "* * * must see that which may be seen, and hear that which *532 may be heard, and he is held to have seen that which he could have and should have seen" and we concluded that the plaintiff's own testimony was convincing that:
"* * * he did not in the least take those precautionary steps which the law expected of him and which common sense and prudence dictated were proper under the circumstances prevailing at the crossing.
"* * * we have reached the conclusion that the proximate cause of the collision was plaintiff's own negligence. * * *"
Assuming arguendo that failure to provide even greater protection at this crossing constituted negligence on the part of the railroad company, a view most favorable to the plaintiff, we are still of the opinion that plaintiff cannot recover for it is a fundamental concept of tort liability that there must be a causal connection between the negligence complained of and the injury sustained, and that, if the injury is not the natural and probable consequence of a defendant's negligence and could not have been foreseen or reasonably anticipated as the probable result of such negligence, there can be no recovery. 44 Am. Jur. pp. 635-637, Railroads, Sec. 420.
In view of the fact that we find no negligence on the part of defendant herein, we conclude that it is unnecessary for us to pass upon the question of whether plaintiff, as a guest passenger, was free from negligence.
For the reasons assigned the judgment appealed from is affirmed.
Affirmed.