REGAN, Judge.-
The plaintiff, Hartford Fire Insurance Company, subrogee of Charles E. Spahr, instituted this suit against the defendants, Texas and New Orleans Railroad Company and the Southern Pacific Railroad Company, endeavoring to recover the sum of $1,080.40, which it had paid to Charles E. Spahr, under a policy of insurance, in, corn sequence of a collision between a 1947 White truck and trailer, owned by Spahr, and a gondola type freight car being pushed by a switch engine operated by employees of the Texas and New Orleans Railroad Company, on June 13, 1947, at í :00 p. m.
The defendant, Texas and New Orleans Railroad Company answered denying that its employees were guilty of any negligence in the premises and, in the alternative, pleaded the contributory negligence of the operator of the truck, Louis Bladsacker, an employee of Spahr.
By stipulation the suit against the Southern Pacific Railroad Compány was dismissed.
From a. judgment of the lower court in favor .of the defendant dismissing the suit, plaintiff prosecutes this appeal.
The record reveals that the insured vehicle, -a White truck and trailer, described as a “1600 gallon tank wagon straight track”, was struck by defendant’s train shortly after it emerged from the Pan Am Distributing Station, located on the west bank of the Haryey Canal. Exit from this station is afforded through the medium of a. shell surfaced driveway which crosses defendant’s tracks and leads to a public road designated as Destrehan Avenue. To reach this avenue it was initially necessary to cross, a spur track and then the' main line. The accident occurred on the main line at about 1 o’clock in the afternoon. The -train, consisted of a locomotive backing up and pushing a single gondola freight car. It was proceeding away from the river so as to advance from the right of vehicles driv-. ing out of the gate of the Pan Am station. To the left of .the gate, attached to the inside of the steel fence, is a sign which reads “Caution Railroad Crossing”. The approach of the train, as it neared the plant, was.masked by a bo-xcar “spotted” on the spur track in front of the adjoining property, the Standard Oil Company of New Jersey, or to the right-of the Pan Am exit and approximately -nine feet- removed therefrom. . From the entrance or exit of the Pan Am property to the center of the defendant’s main line, where the accident occurred, the distance, is approximately twenty-one and a half- or twenty-two feet. The testimony is conflicting as to the exact distance at which the train was no longer hidden by the spotted boxcar. It is conceded that both, the train and the truck were moving very slowly; the train at about four miles per hour and that of the truck from four to “less than 10 miles per hour”; as a result of their respective speeds, when the collision occurred, the train pushed the truck only about seven or eight feet and both vehicles came to rest on the farther side of the driveway.
Only two witnesses testified on behalf of the plaintiff, Bladsacker, the operator of the *769 truck, and John Winston Harris, a passenger therein. .
Bladsacker related that he had been a truck driver, in the employ of the Charles E. Spahr Pan Am Company at Harvey, Louisiana, for approximately ten years and that he traversed these railroad tracks each day and was fully cognizant of their constant usage by the defendant’s trains; when leaving the Pan Am property, driving at a'speed óf four miles per hour, he could' not see to his right because of the boxcar spotted approximately four feet from the entrance on the spur track; after he1 passed the-boxCar and was about one half foot from the main track, the engine of defendant “pops up there pushing a gondola”; that there Was no bell ringing or whistle being blown .by the train nor was a ground switchman signal-ling the approach of the train; a man seated on the gondola car yelled “stop” just a.s the truck was starting to cross the tracks, but that he did not have sufficient time to obey the command and thus avoid the collision; the gondola car struck his truck on the right side about one-quarter óf the length of the truck from'the front thereof and, in consequence, the gondola pushed the truck approximately eight feet before coming to a complete' stop. ,
Harris, whose testimony was taken by deposition and introducd in evidence on the day of the trial, related that he was an employee of the A. O. Smith Meter Corporation on the day of the accident and was ridr ing in the truck, as a passenger, seated to the right of the driver;, there was a fence around the Pan Am Station and that the enT trance thereto or exit therefrom was formed by a gate; there were two sets of tracks between the gate and the main road,. the first of which, a .spur, was located about four feet from the gate and the main track about eight feet from the spur track; he reiterated that these distances were only approximated, as he had never actually measured them; there was a boxcar located “less than fifteen feet” on the spur track; the operator, who was driving the truck “under ten miles an hour”
“* * * drove straight out of the .gate across the first track and was on the second track when we noticed this • gondola car which was pushed by the switch engine approaching us from be-. hind this box car. In other words, we could not see the gondola until we got past this boxcar, and when we saw1 it there were either two or three men standing in the gondola car. They began to frantically wave their hands at uS, and the' engineer, ‘ I guess, and’ I; think I hit the driver on the leg and told 'him to get off the track, "but he tried to ■speed the engine up.1 Before we could get off the track, however, the gondola’1 ■ car hit'us and pushed us-Sideways about seven or eight feet.” ■
Harris .further stated,,.that the train whistle was, not blowing nor was the bell ringing and that, if either of these auditory signals had emanated from the train he is convinced “we- would., never have come out on either of the tracks”, yet when interrogated whether he. was listening for any signals from the approaching, train, Harris conceded “I don’t think I was:. I ■Was just riding, that’s all.”1 Harris was a resident of Houston, Texas, -not in the employ of the Spahr Company,' although his company had installed a'gásoline meter .on the truck, but he did not have any interest in the litigation.
There were eight witnesses who testified on behalf of the defendant,. five of whom, H. S. Byers, Frank Raggio, Kenneth Andrew Genin, Peter F. Dassinger and Harold A- Suchand, were members of the train crew. ■ The engineer and fireman were- seated, in their respective places, in the cab of the engine and the other three men were riding in the gondola car, one on the end nearest the engine and two on the forward or leading end.thereof.. They all conceded the location of where the boxcar was spotted, but related that the train was moving very slowly; that the whistle was blown for the -Pan Am crossing as well as previous crossings and that the bell, automatically controlled, was ringing continuously. In addition, Salvador Boffone, Sr., an independent witness employed by the Southern *770 Shell Fish Company, -situated about three hundred feet from the Pan Am Distributing Station, testified positively that he heard the whistle blowing and the bell ringing immediately prior to the accident.
The engineer, Genin, actually the fireman, who was operating the engine in conformity with a rule of the company permitting qualified firemen to do so under supervision of the engineer, testified that he was seated on the left side of the engine (he was approximately seventy-seven feet, the combined length of the gondola and tender, from the situs of the accident) and thus in the least position of vantage to see beyond the top of the boxcar, therefore, he did not observe the truck until it was hit, at which time the leading edge of the gondola was about halfway over the road crossing; he immediately applied the brakes in emergency upon receiving a stop signal from the crew.
The fireman, Raggio, who was actually the enginer, had a slight advantage in visibility as he Was seated on the right side of the engine and away from the boxcar. He testified that he first observed the truck “when it showed up on the track” and the leading edge of the gondola was about five feet from the driveway, at which time the crewmen, situated thereon, “flagged down” and Genin applied the brakes in emergency “making a.very good stop.”
The two men riding in the leading edge of the gondola were Dassinger and Byers.
Byers, the foreman of the crew, related that he could and did see the truck just inside the Pan Am gate approaching the crossing when he, standing on the leading edge of the gondola, was about twelve feet from the driveway; he threw up his hands and yelled “hold it there”; he continued to observe the truck, noting that it approached the track at a slow speed, but he was not alarmed because “I figured he was going to come right up to about two or three feet clear-of the crossing, like most truck drivers do and stop and let us go on by, especially after I had hollered at him to stop”; when he realized that the train was not coming to a stop as he had anticipated, he immediately flagged the engineer, but the leading edge of the gondola car was about six feet from the truck, too close to avoid hitting it as it pursued its course upon the track.
Dassinger likewise testified that he first saw the truck when it was inside the Pan Am gate; he continued watching it, thinking “he was going to come right there and stop like anybody else does”; at the last minute it seemed to me like the truck suddenly “tried to shoot around the front of us. He did not come straight out the road, he came around, it looked like. He tried to open us, to give it gas to go around. He didn’t come out straight out, he came up to try to get around it.”
Suchand, who was occupying a place on the right rear side of the gondola car nearest the engine, related that he was not in a position to observe what transpired immediately prior to the accident. He simply stated that when he saw the truck it was upon the track, at which moment signals had already been passed to the engineer for an emergency stop.
The other witnesses appearing on behalf of the defendant were its claim agent, Leslie B. Brownlee, who identified photographs taken by him, encompassing the situs of the accident, which were introduced in evidence, and its instrument man, Harris F. Baudoin, who identified a -plat drawn by him. He made exact, measurements orienting the scene of the accident, the most pertinent of which was the distance from the edge of the Pan Am gate to where the boxcar was spotted, which he said, was nine feet. He thereafter projected lines of visibility up the track beyond the boxcar from various -points of vantage in the driveway. He demonstrated that the driver of a truck two or three feet to the right of the center of the driveway could see about thirty feet down the main line track as he came out of the gate; if he was on the righthand side of the driveway, when he had driven ten fee-t out of the gate (the distance from the gate to the main track was twenty-one and a half to twenty-two feet) he could see forty feet down the track and it necessarily followed *771 “that somebody riding a train could see the vehicle as it came out oí the gate when the train was forty feet away.”
The pleadings and the foregoing evidence has posed for - our consideration primarily questions of fact and we have, therefore, made a careful analysis of the context of the record; as a result thereof we are of the opinion, which we obviously share with the trial judge, that auditory warning signals did emanate from the train, and the crew exercised every reasonable precaution possible .in the usual and customary manner in order to warn traffic of the train’s approach, as it advanced towards the Pan Am crossing and, if Bladsacker, the operator of the truck, had heeded these signals he would have stopped before reaching the main track where the accident occurred.
The greater the difficulty of seeing and hearing a train as it approaches a crossing, the greater caution the law imposes upon the operator of a vehicle who anticipates traversing the tracks. The evidential painting of the picture of this accident causes us to believe that if the operator of the truck had exercised reasonable care he would have seen and heard defendant’s train when he had traversed the spur track, but was still short of the main track, where he could have safely stopped.
Plaintiff insists, alternatively, that the members of defendant’s crew possessed the last clear chance to.avoid the accident, in that the crew did or should have discovered the peril of the occupants of the truck in sufficient time to avoid the collision.
In Bordenave v. Texas and New Orleans Railroad Company, 1950, 46 So.2d 525, 529, we observed:
“* * * where the crewmen in charge of a train see an automobile approaching the tracks on-which the train is operating, they are not negligent in assuming that it will stop unless such assumption . is unreasonable under the circumstances. . It necessarily follows that if they persist in this belief and this belief continues to be reasonable until it is no'longer in their power to avoid the accident, there is no negligence on their part and ' no liability attaches to the railroad company.”
We are factually convinced that this is exactly what occurred herein. Byers and Dassinger, the crewmen occupying the leading edge of the gondola, observed the truck approaching the track on which the 'train Was operating, and they were not negligent in entertaining the reasonable assumption that it would stop. The truck was moving very slowly as it emerged from the gate of the Pan Am Station and they had every reason to persist in the belief that it would come to a stop short of - the main line. When they became aware of the fact that ■the truck -Would not stop it was no- longer within'their power’.to circumvent the impending accident.
. We are, therefore, of the opinion that-the crew did not- possess the last clear chance to avoid the accident.
We find no merit in the implication of negligence contained in the statement appearing in plaintiff’s brief to ■the effect “that the person qualified to operate the train as engineer was acting as a fireman, and the fireman, who was not an engineer, was in control of the train”. Nothing,appears in the record which could possibly lead us to find.that Genin was an incompetent engineer. On the contrary, there is uncontradicted testimony revealing that he was qualified to operate the train and, did make a very, good stop as soon as he received the signal from Byers. Proof of negligence, in the air, so to speak, will not do.
For the reasons assigned the judgment appealed from is affirmed.
Affirmed.