JANVIER, Judge.
In the experience on this Court of the author of this opinion seldom if ever has there been presented a case in which our sympathies have made so great an endeavor to dominate our judgment. But seldom if ever has a record made it so absolutely impossible to permit recovery of damages.
An alert, intelligent boy of eleven has lost his left leg by amputation between the knee and the thigh and to that extent will he handicapped for the remaining many years of his life. We, and, we hope the young boy are somewhat comforted by the fact that, in the few years which have elapsed since the accident, he has made such remarkable and praiseworthy progress towards rehabilitation that there is every reason to believe that before long, with the help of his artificial limb, he will be able to accomplish what, in years past, was deemed impossible and that the loss of the leg has but stimulated an ambition which-the record indicates exists to a remarkable degree.
On September 20, 1955, young Alexander Klaus, eleven years of age at the time, with two older brothers, Peter and Louis, after a fishing trip which they made on foot, and, after swimming in a bayou near *306 by, were walking home on or alongside a railroad track which passes through a small settlement known as Little Woods, a few miles from the business center of the City of New Orleans. The tracks belonged to the New Orleans and Northeastern Railroad Company and over the tracks trains of the Gulf, Mobile and Ohio Railroad Company were permitted to operate under contract with the owning railroad.
A freight train of Gulf, Mobile and Ohio Railroad, consisting of a diesel locomotive and more than 80 freight cars, was on its way towards the City, and the leg of the young boy was cut off by a wheel of some part of this train.
Joseph A. Klaus, the father of the boy, charging that the accident had resulted from negligence of operators of the train in failing to notice the boys and in failing to give warning signals, brought this suit for damages against the Gulf, Mobile and Ohio Railroad Company, and, alleging that the Southern Railway Company was the owner of the tracks, made that corporation a joint and solidary defendant. It may be said here that the Southern Railway Company did not own the tracks and that accordingly that corporation was dismissed as a defendant. Counsel for plaintiff concedes that that dismissal was correct. There has been no appeal as against that Company and New Orleans and Northeastern Railroad Company which actually owns the tracks has not been made a party defendant.
The defendant railroad company, conceding the occurrence of an accident in which the young boy lost his leg, denies that he had been struck by the locomotive or any part of the front end of the train, and maintains that the truth is that the boy fell under one of the cars near the rear of the train as he was attempting to “hop” or catch onto the train as it was passing and to thus secure a ride towards his home.
The defendant railroad company also contends that all necessary signals were given and, in the alternative that it should appear that there was negligence on the part of the operators of the train in failing to give signals or otherwise, then the defendant alleges that the sole cause of the accident was the contributory negligence of the young boy in attempting to catch onto the train as it was passing.
There was judgment dismissing the suit and the matter is now before us on appeal.
Of course, if the boy, in attempting to ride one of the freight cars near the rear end of the train, fell and thus sustained the injury, the question of whether the train crew gave any warning signals is of no importance whatever. We think that the evidence to this effect overwhelmingly preponderates. However, in justice to the operators of the train we think it necessary that something be said concerning signals. The evidence convinces us that the whistle was sounded several times shortly before the train reached the spot at which the accident occurred, and that in all probability the bell was also being sounded.
The crew did not see the boys and therefore it is conceded that the signals were not given as a warning to them. However, it is shown that the train had been brought to a stop a short distance before reaching the spot of the accident, this stop resulting from the fact that a ballasting machine of the owning railroad was working on the track on which the train approached and that it was therefore necessary that this machine be crossed over to the other of the double tracks in order that the train might pass. The locomotive whistle was sounded several times in an effort to warn the operators of this machine, and it was also blown to notify the rear end brakeman that he should proceed a distance to the rear of the train to protect it against any other train which might approach. When the ballasting machine had crossed to the other track the whistle was again sounded several times to call back the rear end brakeman.
Such affirmative evidence is entitled to greater weight than would be ordinarily *307 accorded to testimony as to the custom to blow whistles since the crew, in this instance, remembered the particular occasion and remembered the necessity for the giving of those particular signals. The evidence to the effect that the whistles were not blown was purely negative, the several witnesses of plaintiff merely saying that they had not heard any such signals. Such evidence is overcome by positive testimony such as we have discussed.
In Bordenave v. Texas & New Orleans R. Co., La.App., 46 So.2d 525, 530 we said:
“ * * * The rule is well established that negative testimony of this sort will not prevail against positive testimony to the contrary. See 32 C. J.S. Evidence, § 1037(c), p. 1084; Natal v. Louisiana & A. Ry. Co., 1931, 18 La.App. 50, 137 So. 600; Heiman v. Pan American Life Ins. Co., 1935, 1936, 183 La. 1045, 165 So. 195; Hutchinson v. Texas & N. O. R. Co., La.App. 1947, 33 So.2d 139, 142.”
We repeat, however, that whether the signals were given is of no importance when we consider the abundant evidence to the effect that the young boy was attempting to board the train and “hop” a ride and that this took place after .the greater portion of the train had already passed him.
While no witness produced by defendant says that he actually saw the little boy trying to board the train, and while both his brothers deny that they saw the little boy do so, certain statements which they made on various occasions indicate very plainly that there can be no doubt at all that the boy was attempting to catch onto the side of the train as it was passing.
While these brothers admit that they signed such statements, they both deny that they knew what was in the statements and would have us believe that the statements were prepared by others and that they had not read them before signing them.
It seems impossible that the several statements made to different persons by the boys would have been made and would have been so nearly identical if the facts as set forth in those statements were not correct.
The first of these statements was made by Louis Klaus to J. F. Alexander, Jr., who was a telephone maintenance man in the employ of New Orleans and Northeastern Railroad. He was using his car to transport all three boys from the scene of the accident to the hospital at Camp Leroy Johnson on Lake Pontchartrain. On the way to the hospital he asked the boys how the accident happened, and he testified that the one in the Army uniform (Louis) said that:
“ * * * they were walking down the track, and the brother, the little brother that was run over, walked over by the train and was putting his hands up on the brag irons, the handles of the train, and * * * they hollered for him to get away, that they turned to walk on, and * * * they heard the little boy scream and turned around looked, and he was lying by the train with his leg cut off.”
The testimony of Mr. Alexander is criticized by counsel for plaintiff because of the fact that at the trial he seems to have been confused as to which of the older boys was carrying the young boy from the immediate scene of the accident to the vehicle in which he was to be taken to the hospital. It appears that both of the older brothers were in the armed forces of the United States, one in the Marine Corps and one in the Army, and that, when in the Courtroom Mr. Alexander was asked to point out the boy who had carried his younger brother to the car, he pointed to the wrong one of the two older brothers. Since both brothers were in uniform and since Mr. Alexander had seen them for so short a timé after the occurrence and did not see them again until the trial of the case, it is not difficult to understand how he confused the one with the other.
*308 The next statements of the two brothers were taken on the same afternoon by-police officers. The brothers did not deny that they signed the statements, though they say that they did not read them, and that they were so disturbed that they did not know what they were saying and, on the suggestion of counsel, they attempted to convey the impression that their statements were the result of suggestive questions of the police officers. We think that the following statements evidence absolute sincerity on the part of the boys and that in no sense does either indicate that these statements resulted from suggestions of the officers.
In the statement of Peter Klaus we note the following:
“After finishing swimming, we were going to hitch hike home but we were all wet because we went swimming with our clothes on. Couldn’t get a ride so we walked along the tracks. When we got up to the tracks we saw a train coming, Alexander Klaus, my brother said lets hop a train. I told him no, lets dry off and hitch hike. We then started walking down the tracks towards town and noticed some men working on the railroad tracks. I was walking side ways, looking at the men and my brothers which were in front of me. I seen my little brother Alexander, run ahead of me after the engine had past us. I told him to wait for us.”
And in the statement of Louis Klaus appears the following:
“My name is Louis Klaus WM 16 residing 2417 Port St., at about 2:30 p. m., September 20, 1955, we, Alexander Klaus, Peter Klaus WM 18 residing 2417 Port St., had been fishing and we were walking home on the railroad tracks on Haynes Blvd., Alexander Klaus started to run along with a train which was going on the tracks towards New Orleans, La., Peter Klaus called to Alexander to come back. Peter then looked back at the men who were working on the railroad tracks and I looked back too. I turned around and saw Alexander going under the train and then he came out again. * * * ”
On the day following the accident the claim agent of the defendant railroad company called on the two brothers and, in the presence of the mother, obtained statements from them. In his statement to the claim agent, Peter said:
“A little ways south of Little Woods, a freight train passed us on the other track going south. The train was going 25 or 30 miles per hour. When the train had passed except about 8 cars, Alexander ran ahead of us. I called to him to stop and wait for us. Louis called to me, and I looked and saw Alexander lying beside the track. % % ft
* * * * * *
“When we first got to the track and saw the train coming Alexander said, ‘Lets hop it, and go into town.’ I told him not to. I did not see him try to catch the train, and don’t know how he came into contact wtih the train.
“The car that cut Alexander’s leg off was about eight cars from the caboose.”
Louis confirmed his brother’s statement to the claim agent of the railroad, and added that he saw Alexander just as he fell under the train.
In addition to all these statements the record contains a most illuminating piece of evidence. It is shown that the father of little Alexander, a retired United States Army sergeant, apparently was very popular in military circles, and it is also shown that his youngest boy, Alexander, seems to be well known in military circles and apparently had stated, when in the hospital, that he would like to be a Marine. After *309 the accident a collection was taken up by members of the military forces familiar with the case and with this collection there was purchased for Alexander an artificial leg and a child’s Marine uniform.
It is evident that since that time he has made phenomenal progress in overcoming, by the use of the artificial leg, the handicap which has resulted from the accident. Indeed so remarkable has been his progress that it came to the notice of the publishers of a prominent local newspaper and a reporter was sent to the residence to write a story concerning the young boy. Less than one year after the accident this story was published in the weekly magazine published by the newspaper in connection with its Sunday edition, and in it was the photograph of the boy. skating with the use of his artificial leg. There were also statements of other remarkable physical accomplishments.
Just at the time of the publication of this article, which was August 12, 1956, there can be no doubt that plaintiff contemplated filing suit against the railroad company, since almost one year had elapsed and since the suit in fact was filed on September 20, 1956, just a little more than one month after the publication of the magazine article which we have mentioned.
Though there is nothing in the record to show just where or how the reporter came by the information, obviously it was obtained from members of the family since other members of the family are shown with the boy and he is shown in the handsome dress uniform of the Marine Corps which had been given to him. Apparently the family approved of the article, and there is nothing to show that any objection or protest was made when the article appeared.
We quote the opening paragraph of the article, which reads as follows:
“Just for kicks young Alexander Klaus tried to hop a freight one day last Fall on his way home from fishing in Lake Pontchartrain. He didn’t make it.”
Surely we need say no more. The evidence that this young boy was unfortunately the author of his own misfortune is overwhelming.
While it is obvious that it is not necessary to cite authorities, which are abundant, nevertheless we quote the following very pertinent statement from Weeks v. New Orleans, S. F. & L. Railroad Co., 40 La.Ann. 800, 5 So. 72, 74:
“The boy Weeks was attempting to board a moving train, which is universally recognized as a negligent and indiscreet act, constituting such contributory negligence as will debar him from recovering for injury received while so engaged. * * * ”
Though the above was written in 1888, the statement is as legally sound today as it was then.
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.