163 So.2d 553

**DAVIS–DELCAMBRE MOTORS, INC.**

v.

**Martin SIMON.**

**No. 46923.**

May 4, 1964.

further alleged that despite repeated amicable demand, defendant had failed and refused to liquidate the indebtedness.

Marion W. Groner, New Iberia, for plaintiff-appellant.

Willis & Willis, J. B. Willis, St. Martinville, for respondent.

HAMLIN, Justice.

In the exercise of our supervisory jurisdiction (Art. VII, Sec. 11, LSA–Const. of 1921) we directed certiorari to the Court of Appeal, Third Circuit, in order that we might review its judgment which reversed a judgment of the trial court and held invalid because of lack of consideration a promissory note which constitutes the basis of this suit. 245 La. 72, 156 So.2d 607; 154 So.2d 775.

Plaintiff, alleging itself to be the holder and owner in due course of business of a ninety day promissory note made by the defendant, dated June 14, 1957, in the sum of $300.00, payable to the order of State National Bank of New Iberia, bearing interest at the rate of eight percent (8%) per annum from maturity until paid, and providing for attorney's fees, instituted the present proceeding against the defendant for the full amount of the note. Plaintiff

Defendant filed exceptions of no right and no cause of action and non-joinder of parties-plaintiff on the ground that the note was made payable to the order of the State National Bank of New Iberia and was not endorsed by said Bank. In response to the latter pleading, plaintiff filed a supplemental petition alleging that it was the true holder and owner of the instant note; it attached thereto an affidavit from the State National Bank of New Iberia which recognized plaintiff as the true payee. The exception of non-joinder was then overruled by the trial court.

The case was tried on March 19, 1962, but it was held open for a reasonable time for the purpose of obtaining, if possible, the deposition of one Wilmer Mitchel. On March 30, 1962, defendant filed exceptions of no right and no cause of action, averring that there was a failure and lack of consideration for the note sued upon, and that the consideration, if any, was illegal; no answer was filed by the defendant. Defendant was unable to secure the deposition of. Wilmer Mitchel, and the matter was submitted to the trial court for adjudication.[1]  Judgment was rendered in

---

1. In Brief counsel for plaintiff states, "The defendant-appellant, through his attorney, promised to file an answer in this case and agreed that the case could

be set for trial. The case was set for trial on March 19, 1962, and at that time defendant's attorney verbally said his defense would be a denial of all allegations,

favor of plaintiff as prayed for. A new trial was granted for the purpose of re-argument on the point of whether the consideration given for the note sued on was illegal. After argument, the trial court confirmed its original judgment. (As stated supra, this judgment was reversed by the Court of Appeal.)

The facts of record, deduced principally from the testimony given at the trial on March 19, 1962, are to the effect that Wilmer Mitchel, an employee of the defendant, purchased a 1952 Chevrolet from Davis-Delcambre Motors, Inc. on a Saturday during the first week of June, 1957. In payment Mitchel gave two checks dated June 7, 1957, in the amounts of $100.00 and $200.00, respectively, drawn on the State National Bank of New Iberia; the checks were dishonored by said Bank on the Monday following the date of purchase, and plaintiff was informed that Mitchel had no account with the bank. Defendant subsequently issued the instant note.

Earl Joseph Davis, President and General Manager of plaintiff company, testified that he knew Martin Simon, and that Martin Simon signed the note herein sued upon; the note is for the identical amount of the two checks issued by Mitchel. Pertinent testimony of Mr. Davis is as follows:

"Q. Now, Wilmer Mitchel, who is Wilmer Mitchel?

but FAILED TO FILE A WRITTEN ANSWER." The irregularity of this

"A. Wilmer Mitchel is a colored fellow that was working for Martin Simon. He came one Saturday afternoon to buy an automobile. * * *

"* * *

"THE WITNESS: Wilmer Mitchel, to buy an automobile, a cash deal. By this, that there would be no notes, or it wouldn't be a time transaction. He gave us two checks, one dated—that was on a Saturday afternoon—one dated that day, and the other check dated for a week to follow. Monday morning we go to the bank to cash his check, and the check was no good, no account. And we got a hold of Mitchel, and he promised to make the checks good. And it was sometimes, oh, possibly a week or two weeks later before we was able to contact him again. He was working for Martin Simon. And Simon came in one afternoon and said that he was going to sign that check for Mitchel, rather, sign the note to clear Mitchel, because I was threatening to have him locked in jail for giving me bad checks.

proceeding has not been urged in this Court by counsel for the defendant.

"Q. Mr. Davis, at this point I show you two checks and ask if you can identify these two checks.

"A. Yes, sir. That's two checks made by Wilmer Mitchel for an automobile, 1952 Chevrolet. That was a cash sale.

"Q. And these were the two checks that the note replaced, is that correct?

"A. That's right.

"Q. In other words, Martin Simon was executing this note to take care of this indebtedness due by Mitchel. Is that right?

"A. That's right.

" *  *  *

"Q. Whereabouts was this note dated June 14, 1957, executed?

"A. In the office, my office.

"Q. In New Iberia. Is that correct?

"A. In New Iberia.

"Q. You were present, sir?

"A. Yes, sir. The fact is, I had them to draw the note up, and as you can see, put his cross on there. And it was witnessed by Bernie Granger and Mary Crochet.

" *  *  *

"THE WITNESS: We were going to have Wilmer Mitchel picked up and placed in custody for bad

checks. And Martin Simon came in, said that he needed him to save his cane.

"Q. At that time, was Martin Simon a cane farmer?

"A. A cane farmer.

"Q. And Mitchel was working for Simon, correct?

"A. Mitchel was working for Simon. In fact, Simon brought Mitchel there with him at one time when he came into the place. But when he came in to sign the note, he was alone.

"Q. Who was alone?

"A. Martin Simon.

"Q. Has Martin Simon ever made any payments on this note?

"A. No, sir, we've sent him repeated requests for payments, letters, telephone calls. One time he came into the place and said that —and I told him that we'd have to take legal action. Well, he said, 'You can take legal actions, if you want.' He said, 'I've got a lot of judgments against me. It doesn't make any difference.' And said he had hard luck. He had one of his tractors to burn. He wasn't able to pay right then. I said, 'Didn't you have insurance on it?' He said, 'Yes, I had

insurance on my tractor.' I said, 'Well, it didn't cost you but very little repair to repair that tractor if you had insurance on it.'

"Q. Has he ever made any additional promises to you that he would take care of this note?

"A. No, that was the last time that I was able to contact him personally. We had sent him repeated requests.

"Q. And you dropped all further action against Mitchel once you had received the note. Is that correct?

"A. That's right."

On cross-examination, Davis testified:

"Q. Have you taken any action against Mitchel, Mr. Delcambre [Davis]?

"A. Any legal action? No, he had give me those two checks that was no good. He had no account at the bank even, and I had requested him to come on and make those checks good.

"Q. And if Martin Simon hadn't paid, you would have had him picked up?

"A. Yes, sir, that's right. Martin Simon didn't pay. He signed the note to pay to cover those checks.

"Q. Well, if Martin Simon had not given you the note, as you say you would have had Red picked up and put in jail on criminal charges?

"A. That's right, Wilmer T. Mitchel, 'Red' Mitchel.

"Q. You would have had him picked up and put in jail?

"A. Yes, sir.

"Q. And you would have filed a criminal charge of bad checks, is that right?

"A. Yes, sir.

"Q. Now, so your contention is that the value received for the note by Martin Simon was the bad checks of Wilmer Mitchel, is that right?

"A. That's right."

Our appreciation of Davis's testimony is that it is devoid of any statement to the effect that he influenced Simon to sign the note or that he pressured him into such action by the exercise of threats or violence on Simon. He said that he did not return the checks to Simon or Mitchel. (They are now a part of this record.)

Bernie Granger testified that he was employed as parts manager by plaintiff when the instant note was signed. He stated that he signed the note as a witness, and that Simon placed his mark on the

note in his presence. His testimony is devoid of any statement to the effect that violence or threats were exercised upon Simon.

Mary Crochet, bookkeeper-secretary for plaintiff, testified that she signed the instant note as a witness, and that she witnessed Martin Simon's signature. She said that the note was given to prevent Mitchel from going to jail. Her testimony is also devoid of any statement to the effect that any violence or threats were exercised upon Simon.

The note sued upon bears the defendant's name on the signature line in addition to a cross mark. The defendant testified that he had never attended school and could not sign his name; he said he had to use an "X" mark; he denied that he signed the note sued upon. He testified that Davis had never requested him to pay the instant note, and that he had never promised to pay it. He admitted that Mitchel worked for him but said Mitchel did not work for him at the time the instant Chevrolet was purchased. Defendant knew Davis and was familiar with the car bought by Mitchel. He admitted that he went to see Davis about taking the car back; when asked what Davis told him, Simon responded, "He didn't told me anything." Simon also testified that Mitchel had been in previous trouble, and that Mitchel had previously signed his [Simon's] name by placing a cross similar to that affixed to the present note. Insofar as the instant note, he testified that he did not know who signed his name. Simon's testimony with respect to the checks given by Mitchel is confusing; he said that he had seen them in a lawyer's office. No testimony was adduced from Simon with respect to any threats, violence or pressure exerted upon him by Davis.

Pertinent testimony of Simon is as follows:

"Q. Now, was Mitchel in any sort of trouble with Mr. Davis, do you know, at that time?

"A. Not that I know, no, sir.

"Q. Do you know about any checks that Mitchel had signed to Mr. Davis?

"A. No, sir. Mr. Davis never tell me nothing about no checks.

"Q. Did Mitchel talk to you about his checks?

"A. No, sir.

"Q. Did he talk to you about he might have to go to jail?

"A. No, sir.

"Q. Did you know that he might have to go to jail and he wouldn't be able to work for you?

"A. No, sir, I didn't know that."

In reversing the trial court, the Court of Appeal relied on the case of Perry v.

Frilot, 6 Mart., N.S., 217, which we find inapposite to the present matter. We agree with the following distinction made by Judge Hood in his able dissent in the present matter:

"The majority apparently relies principally on the case of Perry v. Frilot, 6 Mart. (N.S.) 217, as authority for its holding. In my opinion that case does not support the views expressed by the majority in the instant suit, because there the son was an insolvent debtor, and the plaintiff had agreed as a part of the consideration for the father's promise to pay a portion of the debt that plaintiff would 'get the other creditors to sign; that is, that he would deceive them,' and would assist the son in fraudulently making a surrender of his effects. * * *"

Herein, the Court of Appeal found:

" * * * the obvious consideration for the note in question was the forbearance to prosecute Mitchel for issuing a worthless check. We need not enter into any detailed discussion that such an act is a crime. See LSA–R.S. 14:71. In our opinion, it is axiomatic that the promise to suppress the prosecution of this crime is contra bonos mores and results in rendering the note sued upon void for lack of consideration. * * *"

▉ The intent to defraud is an essential ingredient of the offense of issuing worthless checks, LSA–R.S. 14:71; such intent must be alleged and proved. State v. Clayton, 236 La. 1093, 110 So.2d 111; State v. McLean, 216 La. 670, 44 So.2d 698; State v. Alphonse, 154 La. 950, 98 So. 430. Herein, Wilmer Mitchel drew two checks on a bank in which he had no account; they were dated June 7, 1957, and the note allegedly given to cover the checks was executed on June 14, 1957, one week after the date of the checks. We do not find that plaintiff has proved an intent to defraud on the part of Mitchel; neither was there a sufficient lapse of time for there to be presumptive evidence of Mitchel's intent to defraud. Likewise, no written demand was made upon Mitchel to pay the dishonored checks. "The offender's failure to pay such check, * * * within ten days after the receipt by him of written notice of its nonpayment upon presentation, shall be presumptive evidence of his intent to defraud." LSA–R.S. 14:71. We cannot presume therefore that Wilmer Mitchel was guilty of violating LSA–R.S. 14:71, without proof of his intent to defraud plaintiff. It follows that if Mitchel was not guilty of violating LSA–R.S. 14:71, Simon and Davis were not guilty of compounding a felony prohibited by LSA–R.S. 14:131.

▉▉ We now approach a determination as to whether the defendant really affixed his cross mark (such action being equivalent

to signing his name) to the instant note. The testimony of plaintiff's witnesses is positive to the effect that the defendant did affix his mark to the note; the testimony of defendant is negative. A study of the testimony, supra, convinces us that under the facts of this case, the general rule that negative testimony will not prevail against positive testimony is applicable. See, Klaus v. Southern Railway Company, La.App., 107 So.2d 305; Franklin v. New Orleans Public Service, La.App., 187 So. 126; Wiener v. Crystal Oil Refining Corporation, 183 La. 879, 165 So. 131; Hutchinson v. Texas & N. O. R. Co., La.App., 33 So.2d 139; Short v. Central Louisiana Electric Co., Inc., La.App., 36 So.2d 658.

■ We conclude that Martin Simon did sign the instant note. We also conclude from a reading of the testimony, supra, that Davis did not make a promise to suppress the prosecution of Mitchel, and that no threats, violence or pressure were exerted upon Simon so as to vitiate his consent. See, LSA–R.C.C. Arts. 1819 and 1850.

■ Having found that under the facts of this case, Mitchel was not guilty of the offense of issuing worthless checks with intent to defraud, that no promise to suppress the prosecution of Mitchel was made by Davis, that Simon and Davis were not guilty of compounding a felony, that no threats, violence or pressure were exerted upon Simon so as to vitiate his consent, and that Simon did affix his mark to the note involved, we approach a determination as to whether there was a valid consideration for the note. We find that the debt due by Mitchel to plaintiff for the price of the 1952 Chevrolet was sufficient consideration to support the promise of a third party, Simon, to pay. Paige v. Mesico, La.App., 144 So.2d 908; Louisiana Store & Market Equipment Co. v. Moore, La.App., 167 So. 477. We do not find that the agreement between plaintiff and the defendant was unlawful or forbidden by law. We conclude that the consideration for the note is valid and that the note is enforceable.

Because of our findings, supra, it is not necessary that we consider relator's other contentions with respect to alleged errors committed by the Court of Appeal.

For the reasons assigned, the judgment of the Court of Appeal, Third Circuit, is reversed and set aside. The judgment of the trial court is affirmed. All costs are to be paid by defendant.