640 So.2d 708 (1994)
Debra WILLIS, Plaintiff-Appellee,
v.
DRY CREEK NUTRITION SERVICES, Defendant-Appellant.
No. 94-45.
Court of Appeal of Louisiana, Third Circuit.
June 1, 1994.
*709 Larry B. Minton, Alexandria, for Debra Willis.
Steven Claude Judice, Baton Rouge, for Dry Creek Nutrition Services.
Before GUIDRY, C.J., and YELVERTON and WOODARD, JJ.
GUIDRY, Chief Judge.
In this workers' compensation action, defendant, Dry Creek Nutrition Services, appeals a ruling by the Office of Workers' Compensation (OWC) finding plaintiff, Debra Willis, to be temporarily and totally disabled and awarding penalties and attorney's fees.

FACTS
In April 1990, plaintiff, Debra Willis, was hired by Dry Creek Nutrition Services (Dry Creek) as a dishwasher and kitchen helper. This was Ms. Willis' first job in three years, having spent that period of time exclusively as a homemaker. Ms. Willis' work at Dry Creek involved handling of large, heavy aluminum pots and pans. She would report to work at 9:00 a.m. to find the sink stacked full with the large pots and pans, most of which were filled with water. Ms. Willis' primary duties consisted of washing, rinsing, drying and storing these pots and pans, some of which were kept on overhead shelves. Additionally, she sometimes removed cooked food from the oven or carried pans full of frozen food from the freezer to the cooks' work station.
Sometime in May, plaintiff began to experience pain in her right hand and arm, and a "knot" developed on the back of her right hand near her wrist. She reported this to Ms. Diana Honea who informed plaintiff that she (Ms. Honea) would seek permission for plaintiff to see "the company doctor". Permission was slow in coming until June 21, 1990 when, as plaintiff puts it, her wrist popped. She was sent to see Dr. Flynn Taylor the next day.
Dr. Taylor found plaintiff had a ganglion cyst on the back of her right hand and told her the only treatment he could offer was surgical removal. Ms. Willis agreed to this recommendation and surgery was scheduled for July 11, 1990. Ms. Willis continued to work until July 10, 1990, the day she was admitted to the hospital for surgery. Dr. Taylor successfully removed the cyst which *710 he found adhered to two tendons in plaintiff's wrist.
On July 23, 1990, Dr. Taylor removed Ms. Willis' sutures and noted that her wound was healing well. She returned to his office on August 13, 1990 complaining of tingling in her fingers and inability to fully flex her wrist. This, Dr. Taylor attributed to post-operative swelling putting pressure on a nerve. On her next visit, August 27, 1990, Ms. Willis complained of some numbness in her fingers. In his deposition, Dr. Taylor admitted, that in retrospect, he feels that perhaps he did not place enough significance on Ms. Willis' post-operative complaints. In any event, he released her to return to work at that time. She returned again on September 26, 1990 complaining of shoulder pain which increased with activity. Dr. Taylor could find no basis for this complaint and once again told plaintiff she could return to work. Ms. Willis attempted to return to work October 8, 1990, but, upon attempting to lift one of the heavy pots, twisted her wrist causing extreme pain and necessitating her leaving work. Plaintiff was last seen by Dr. Taylor on October 10, 1990, at which time she complained she was still unable to lift heavy objects. Her numbness had subsided and Dr. Taylor noted no limitation of movement in Ms. Willis' wrist. During his course of treatment, he never diagnosed carpal tunnel syndrome, shoulder impingement syndrome, or thoracic outlet syndrome.
Beginning October 15, 1990 thru April 13, 1992, Ms. Willis was treated by Dr. Marion Milstead. During his initial visit with plaintiff, Dr. Milstead diagnosed right shoulder impingement syndrome, a condition he described as comprised of three elements: rotator cuff tendinitis, bursitis and biceps tendinitis. Ms. Willis also had a positive Tinel's test over the supraclavicular area, a finding which the doctor related to a thoracic outlet syndrome. Plaintiff also exhibited some unusual dryness in the right hand. These test results and symptoms remained constant over her next two visits.
When on her December 4, 1990 visit Ms. Willis complained that only non-use of her hand gave her any relief, Dr. Milstead repeated the examination of her shoulder and also examined her lower arm. His findings involving the shoulder were the same, impingement syndrome and probable thoracic outlet syndrome. When he examined her lower arm, he elicited a positive Tinel's and a positive Phalan's test over the carpal tunnel. These findings, along with plaintiff's other symptoms, numbness and tingling in the fingers, led Dr. Milstead to additionally diagnose Ms. Willis as having carpal tunnel syndrome. Her complaints and symptoms remained constant from that time forward, throughout the course of his treatment.
In his deposition, Dr. Milstead explained the causes of the three conditions he diagnosed Mrs. Willis as having thusly:
There's multiple causes of carpal tunnel syndrome. The most common cause that we see is occupational related repetitive motion. Now, that's the majority of the people I see come in my office are related to occupations of some type. You can see it in nonoccupational related problems people's hobbies or sportsbut it's still repetitive motion of some kind....
In the impingement syndrome, there's three factors: the bursitis; the rotator cuff tendinitis, which is one of the tendons actually within the shoulder; and then the biceps tendinitis, which is the tendon that comes up the front of the arm and goes into the shoulder. All three of these conditions are seen in people who do a lot of, again, repetitive motion with over-the-head lifting and raising their arms up and down. It's also ... again, like we talk about carpal tunnelthere's other reasons.
. . . . . .
Thoracic outlet syndrome is a pinched nerve, much like carpal tunnel, but just occurring in a different location. It occurs up underneath the collar boneright at the base of the neckwhere a large group of nerves, called the brachial plexus, comes underneath the collar bone. And the thoracic outlet syndrome is a condition where those nerves become inflamed and irritated from being pinched. This condition is seen more commonly in women, and it's also seen more commonly in people who do lifting type activities.
*711 Dr. Milstead also stated that heavy lifting of the type done by Ms. Willis would cause these conditions to manifest themselves more quickly than light or moderate lifting.
When asked to directly relate these conditions to Ms. Willis' employment with Dry Creek, Dr. Milstead explained:
... And I think there's been some confusion in some of the reports that I've dictated in the past, and I hoped to clear this up previouslybecause I've mentioned that I think all of these conditions she has are related to her work. But where the confusion occurred, I mean, the question was askedI don't think the impingement syndrome and the carpal tunnel syndrome are related to the ganglion. The ganglion was a work related problem. It came on when she was washing dishes, and she suddenly had this knot come up. That was treated. And then this other stuff started coming when she was working. I think they're all related to her job, but they're not related to each other.
... If she had not been doing the job that you mentioned, she could very well have developed a carpal tunnel syndrome at some point in the future from doing other activities that may have been repetitive motion. I think this ... but she's proven, based on the time relationship of when these symptoms occurredwhich is, as I said in my opinion, was related to the activities she was performing in his [sic] jobthat this repetitive nature brought it on. So, to answer your question, I mean, she may have gone several years before she developed a carpal tunnel syndrome if she had not been doing that job. She may have never developed it. I can't say....
Debra Willis was also seen by Dr. Clifton Shepherd on one occasion at defendant's request. After his examination on March 5, 1991, Dr. Shepherd concluded: "... I don't see a reason why this woman could not return to work without restrictions". In his deposition, Dr. Shepherd explained that his opinion was based not only upon his examination but on Ms. Willis' records which showed a lack of objective findings. He specifically commented on a negative nerve conduction study (EMG) and stated he did not consider Phalan's test objective. He further noted the lack of a relationship between her ganglion cyst and carpal tunnel syndrome. However, Dr. Shepherd did also state the following: "When it comes to knowledge of hand and wrist disorders and to facts, I certainly would defer to Dr. Milstead".
When asked to comment on Dr. Shepherd's opinion, Dr. Milstead stated that recent literature indicates that up to 8% of people with carpal tunnel syndrome have no positive objective findings (such as a positive EMG). Dr. Milstead also stated that, in his opinion, both Tinel's test and Phalan's test are objective. Finally, while Dr. Milstead stated he agreed with Dr. Shepherd that Ms. Willis' ganglion cyst and carpal tunnel syndrome were unrelated medically, he also opined that the precipitating cause of all of plaintiff's symptoms was the heavy repetitive nature of her work with Dry Creek.

LAW AND DISCUSSION
On appeal, appellant, Dry Creek, first argues the OWC hearing officer erred in finding Ms. Willis had met her burden of proof, establishing she was temporarily and totally disabled.
La.R.S. 23:1031.1(B) provides in pertinent part:
An occupational disease means only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease. Occupational disease shall include injuries due to work-related carpal tunnel syndrome....
Inasmuch as Ms. Willis had worked for Dry Creek less than one year before her problems arose, Section (D) of that same statute, which provides the following, is applicable:
Any occupational disease as herein listed contracted by an employee while performing work for a particular employer in which he has been engaged for less than twelve months shall be presumed to be non-occupational and not to have been contracted in the course of and arising out of such employment, provided, however, that *712 any such occupational disease so contracted within the twelve months' limitation as set out herein shall become compensable when the occupational disease shall have been proved to have been contracted during the course of the prior twelve months' employment by an overwhelming preponderance of evidence.
Considering the foregoing statutory law and the hearing officer's statement that she found plaintiff "met her burden of proof", we must assume that the hearing officer found that Ms. Willis proved her disability by "an overwhelming preponderance of evidence".
The standard of appellate review in workers' compensation cases is the manifest error/clearly wrong standard. Chevalier v. L.H. Bossier, Inc., 617 So.2d 1278 (La.App. 3rd Cir.1993). That standard of review is meticulously set out by our Supreme Court in Rosell v. ESCO, 549 So.2d 840 (La.1989) and was reiterated and refined in Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La. 1993).
In addition, our review in this case is made in light of the following settled principles:
It is well-settled that the treating physicians' testimony will ordinarily be given greater weight than the testimony of a physician who examines a plaintiff for diagnosis only. Martin v. Travelers Insurance Co., 546 So.2d 958 (La.App. 3rd Cir.1989); Sepulvado v. Williamette Industries, 459 So.2d 1342 (La.App. 3rd Cir. 1984).
Chevalier, supra, at 1284.
... The determination of disability by the trial judge is a finding of fact. The amount of weight the trial judge places on expert testimony and his resulting findings of fact are entitled to great weight on appeal. Andrus v. Rimmer & Garrett, Inc., 316 So.2d 433 (La.App. 3 Cir.1975).
Positive findings of medical experts are given greater weight than negative findings regarding the existence of a particular condition. Campbell v. Luke Construction Co., 465 So.2d 688 (La.1985).
Jackson v. D.C. Kile, Inc., 614 So.2d 225 (La.App. 3rd Cir.1993), at 228.
In order for the employee to recover it must be determined that his employment somehow caused or contributed to his disability, but it is not necessary that the exact cause be found. Lubom v. L.J. Earnest Inc., 579 So.2d 1174 (La.App. 2d Cir. 1991); Patterson v. GNB Battery, Inc., 569 So.2d 640 (La.App. 2d Cir.1990), writ denied, 573 So.2d 1134 (La.1991).
Shelton v. E.B. Wall, 614 So.2d 828 (La.App. 2d Cir.1993), at 832.
In Louisiana, it is well settled that an employee's disability is compensable if a preexisting condition or disease is activated or precipitated into a disabling manifestation as a result of work. Hammond v. Fidelity & Casualty Co. of New York, 419 So.2d 829 (La.1982); Duncan v. State, DOTD, 556 So.2d 881 (La.App. 2d Cir. 1990).
Austin v. Howard Discount Stores, Inc., 569 So.2d 659 (La.App. 2d Cir.1990), at 664.
Appellant makes much of Dr. Milstead's admissions that he could not say whether plaintiff had these underlying conditions prior to April 1990 and whether or not her symptoms would have appeared had she not been employed by Dry Creek. This argument is hollow. The record establishes that Ms. Willis had no symptoms before her job with Dry Creek and, according to Dr. Milstead, her symptoms are directly attributable to that employment. What could have been or may have been is of no moment in the face of what actually transpired.
Considering the foregoing principles of law, the evidence presented and the standard of appellate review, we cannot say the conclusion reached by the hearing officer on the issue of plaintiff's disability is clearly wrong.
La.R.S. 23:1201(E) authorizes the imposition on an employer of twelve percent (12%) penalty on any untimely paid benefit, unless the "employee's right to such compensation or medical benefits has been reasonably controverted by the employer ...". Further, La.R.S. 23:1201.2 provides in part:
"Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance *713 is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of all reasonable attorney's fees for the prosecution and collection of such claims".
In this case, penalties and attorney's fees were awarded. We reverse. Plaintiff's original complaint stemmed from a ganglion cyst. This condition was treated with surgical intervention and plaintiff fully healed from her surgery by October 1990. She thereafter attempted to return to work. After approximately one hour she stated that she had twisted her wrist causing incapacitating pain. It was natural for her employer to assume that this incident was a continuation of her prior problem. Thereafter she began seeing Dr. Milstead. In his deposition of December 3, 1992, Dr. Milstead stated, "I think there's been some confusion in some of the reports that I've dictated in the past ...". We take this statement as true. It certainly would account for Dry Creek sending Ms. Willis to Dr. Shepherd for an independent evaluation, which from Dr. Shepherd's deposition, appears to have been targeted at identifying or ruling out some connection between her ganglion cyst and her carpal tunnel syndrome and other symptoms. His opinion was that Ms. Willis could return to work without restriction.
Considering the fact that there is no medical connection between Ms. Willis ganglion cyst and her subsequent problems; the admitted confusion in Dr. Milstead's reports and the deposition of Dr. Shepherd in which he refers to his report of March 6, 1991 which he sent to defendants; and, the proof required in such cases, "... an overwhelming preponderance of evidence", we find Dry Creek had a reasonable basis upon which to question plaintiff's continuing disability and that its actions were not arbitrary and capricious or without probable cause. We therefore find that the award of penalties and attorney's fees was clearly wrong. See Slate v. Travelers Insurance Company, 556 So.2d 903 (La.App. 3rd Cir.1990), and Coley v. Wilson Oil Company, Inc., 620 So.2d 445 (La. App. 3rd Cir.1993).
For the reasons stated, that portion of the OWC judgment awarding plaintiff, Debra Willis, penalties and attorney's fees is reversed. In all other respects, the judgment appealed from is affirmed. Costs of this appeal are assessed to Dry Creek Nutrition Services.
REVERSED IN PART, AFFIRMED IN PART AND RENDERED.