661 So.2d 588 (1995)
Malisa B. DIBLER, Plaintiff-Appellee,
v.
HIGHLAND CLINIC, Defendant-Appellant.
No. 27274-CA.
Court of Appeal of Louisiana, Second Circuit.
September 27, 1995.
*589 Wiener, Weiss, Madison & Howell by Larry Feldman, Jr., Shreveport, for appellant.
Hicks & Hubley by Craig O. Marcotte, Shreveport, for appellee.
Before MARVIN, C.J., and BROWN and WILLIAMS, JJ.
MARVIN, Chief Judge.
In this appeal of a judgment in a workers' compensation action, the employer, Highland Clinic, contends the WCHO was clearly wrong in awarding benefits on the finding that the claimant's carpal tunnel syndrome, tardy ulnar palsy and thoracic outlet syndrome were occupational diseases compensable under the w.c. law. LSA-R.S. 23:1031.1.
We affirm.

DISCUSSION
LSA-R.S. 23:1031.1 provides in part:
B. An occupational disease means only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease. Occupational disease shall include injuries due to work-related carpal tunnel syndrome...
Because claimant, Ms. Dibler, had worked for Highland Clinic less than one year before her problems arose, § D of LSA-R.S. 23:1031.1 casts her with this heightened burden of proof:
D. Any occupational disease as herein listed contracted by an employee while performing work for a particular employer in which he has been engaged for less than twelve months shall be presumed to be non-occupational and not to have been contracted in the course of and arising out of such employment, provided, however, that any such occupational disease so contracted within the twelve months' limitation as set out herein shall become compensable when the occupational disease shall have been proved to have been contracted during the course of the prior twelve months' employment by an overwhelming preponderance of evidence. (Emphasis added).
See Willis v. Dry Creek Nutrition Services, 94-45 (La.App. 3d Cir. 6/1/94), 640 So.2d 708.
Whether plaintiff has a work-related occupational disease that is disabling presents a question of fact. Vargas v. Daniell Battery Mfg. Co., Inc., 93-1249 (La.App. 1st Cir. 5/20/94), 636 So.2d 1194. In a w.c. case, as in other civil cases, the applicable standard of review is whether the hearing officer's findings of fact are manifestly erroneous or clearly wrong. Freeman v. Poulan/Weed Eater, 93-1530 (La. 1/14/94), 630 So.2d 733; Bruno v. Harbert Intern., Inc., 593 So.2d 357 (La.1992).
Dibler's employment with Highland Clinic began on June 11, 1990. She worked as an *590 assistant to Dr. James Batte, an oral surgeon, for 11 days before going on a two-week vacation she had already planned with her family. She returned to work as an oral surgeon's assistant on July 5, 1990.
Dibler's duties as Dr. Batte's assistant included repetitive motions with her right arm during surgeries. Dibler testified that she assisted Dr. Batte in 167 surgeries, a daily average of less than four surgeries. While each surgery took from 15 to 30 minutes, Ms. Dibler manually cleaned instruments, developed x-rays, performed administrative duties and cared for patients during the remainder of her work day.
On August 1, 1990, Dibler consulted Dr. Don Burt, orthopedic surgeon, telling him that she had been experiencing pain and tingling in her right hand for approximately two weeks. Dr. Burt saw Dibler again on August 15, 1990. On his findings and the history related to him by Dibler, Dr. Burt concluded that Dibler was suffering from work-related carpal tunnel syndrome. Dr. Burt testified that he assumed (albeit erroneously) that Dibler performed secretarial work involving a lot of typing. He further stated that he had no basis for his statement in a medical report that Dibler's carpal tunnel syndrome was caused by her employment except for what Dibler herself told him. Dr. Burt testified that he did not have sufficient information to determine the cause of Dibler's carpal tunnel syndrome. Ms. Dibler then saw an orthopedist specializing in the hand who diagnosed Ms. Dibler with tardy ulnar palsy and thoracic outlet syndrome on August 17, two days after she last saw Dr. Burt. Dr. Burt recalled an instance where an automobile worker handling some extremely strong tongs developed carpal tunnel syndrome in a period of 24 hours from repetitive motion. Upon being told that Ms. Dibler was a dental assistant, Dr. Burt noted that that was one of the occupations that will cause carpal tunnel syndrome.
After seeing Dr. Burt, Ms. Dibler consulted Dr. Marion Milstead, an orthopedic surgeon specializing in the hand, who first examined her on August 17, 1990. Dr. Milstead agreed with Dr. Burt's diagnosis of Dibler's condition as carpal tunnel syndrome while making the additional diagnoses of tardy ulnar palsy and thoracic outlet syndrome. Dr. Milstead opined that all three conditions were work related. The employer emphasizes in its argument that Dr. Milstead made no inquiry into Dibler's work history, did not determine the short length of time that she had been employed at Highland Clinic, and did not know the nature of Dibler's exact responsibilities. Dr. Milstead initially assumed she served Dr. Batte, who was also a dentist, as a dental assistant. Dr. Batte opined that a dental assistant's work is more intense and of longer duration, about eight hours each work day, than the work of an oral surgeon's assistant. Notwithstanding the employer's cross-examination, Dr. Milstead's opinion that the cause of each of her afflictions was work related was not enervated or changed.
Ms. Dibler last worked for Dr. Batte on August 22. Dr. Milstead performed right carpal tunnel release surgery on Dibler on August 23, 1990. After Dibler returned to work at Highland Clinic on September 24, 1990, as a float nurse she continued to experience problems with her right arm, elbow and hand during the next year. Surgeries (the tardy ulnar palsy release) on Dibler's elbow were performed in August 1991 and January 1992 by Dr. Milstead and his medical partner, Dr. Lewis Jones. Following these surgeries, Dibler was unable to return to work.
In October 1991, Dr. Milstead referred Dibler to Dr. Thomas Pressly, a rheumatologist. The employer also emphasizes Dr. Pressly's opinions that the shortest time he has seen carpal tunnel syndrome appear is after four months of a change in activity and that it was "very unlikely" that Dibler's problems were work related. The employer additionally emphasizes Dr. Pressly's "doubt" that her tardy ulnar palsy was work related and his explanation that it is "very difficult" to determine the cause of this affliction. Other portions of Dr. Pressly's opinions, such as Ms. Dibler having a pre-existing CTS condition that was aggravated and his deference to Dr. Milstead's opinion about causation, were emphasized by the WCHO.
*591 Dr. Lewis Jones, Dr. Milstead's partner, was asked, but declined, to give an opinion whether the cause of each of Ms. Dibler's problems was related to her work at the clinic, deferring instead to Dr. Milstead's opinion. The employer emphasizes in its argument that Dr. Jones said he did not consider tardy ulnar palsy to be an occupational disease in the absence of some specific trauma, and explained that he had never seen a case of nontraumatic tardy ulnar palsy that was caused by a person's employment.
Each of the three doctors (Burt, Milstead and Pressly), however, acknowledged he had seen and treated other patients with carpal tunnel syndrome or tardy ulnar nerve palsy that was caused by the performance of work activities. Ms. Dibler consistently stated that she had no problems with her arm, hand or wrist until after she had worked for some two weeks following her return to work on July 5. Dr. R.C. Tilbury, a pediatrician who employed Ms. Dibler before she began working for Dr. Batte, testified that Ms. Dibler never complained or exhibited problems with her hand or elbow during the two years she worked for him.
The employer also emphasizes in its argument the short periods of time Ms. Dibler worked before and after her 1990 vacation, June 11-22, July 5-August 22. One successful w.c. claimant with a long history of dermatitis (caused by allergies to uncured wood and certain metals) had worked only about two months before a "flare-up" of that disease occurred, disabling him for about 10 weeks. See Henry v. Allied Industrial Services, Inc., 447 So.2d 1204 (La.App. 5th Cir. 1984), writ not considered. Compare other cases such as Hebert v. Lake Charles American Press, 427 So.2d 916 (La.App. 3d Cir. 1983); Allums v. Dixie Metals Co., 369 So.2d 1204 (La.App. 2d Cir.1979), and Stutes v. Grey Wolf Drilling Co., 528 So.2d 1097 (La. App. 3d Cir.1988), writ denied. Here, Ms. Dibler had worked about two weeks in June and more than five weeks after July 5, 1990, before her symptoms became disabling.
Noting the statutory burden of proof, the WCHO accepted and gave greater weight to the lay testimony and to Dr. Milstead's opinion that Dibler's carpal tunnel syndrome, tardy ulnar palsy and thoracic outlet syndrome were caused by her work activities. Dr. Milstead's opinion was based primarily on the fact that her symptoms manifested themselves suddenly while she was working. According to our understanding of this record, symptoms of each of the three afflictions arise because an identifiable nerve in a particular passage (the carpal tunnel being in the wrist, the ulnar nerve in the elbow, and the brachial plexus nerves in the thoracic outlet just below the cervical vertebrae) becomes inflamed and irritated, producing objective symptoms.
Work-related carpal tunnel syndrome is expressly included as an "occupational disease" in the statute. Neither tardy ulnar nerve palsy nor thoracic outlet syndrome is among the diseases expressly excluded from being classified as occupational diseases. § 1031.1B.
The issue is not whether each of the three ailments may be found to be an occupational disease, but whether each of the three, on this record, has been proved to have been contracted by Ms. Dibler because of her work activities between July 5 and mid-August 1990. Even a "listed" occupational disease (carpal tunnel syndrome, sometimes abbreviated as CTS) that arises during the first 12 months of employment is presumed not to be work related unless it is proved "to have been contracted during the course of the prior twelve months employment by an overwhelming preponderance of evidence." § 1031.1B.

When a Disease is "Contracted"
An occupational disease is "contracted" when the disabling symptoms are manifested or death occurs. See Holmes v. Pottharst, 438 So.2d 622 (La.App. 4th Cir.1983), writ denied; Hawkins v. Johns Manville Corp. 418 So.2d 725 (La.App. 4th Cir.1982); Cole v. Celotex Corp., 599 So.2d 1058 (La. 1992).

Burden of Proof
The accepted meaning of the phrase preponderance of the evidence in Louisiana is evidence which the trier of fact finds "more probable than not," "of greater weight ... *592 more credible and convincing," that "overbear[s], in some degree, the weight [of the evidence] upon the other side [of the case]." See Braud v. Kinchen, 310 So.2d 657, 659 (La.App. 1st Cir.1975).
The legislature has used the phrase overwhelming preponderance of evidence as the statutory burden of proof in this case, but without defining the phrase. In its ordinary sense, according to our search into several dictionaries, the word overwhelm simply means to greatly overcome, to overcome by superior weight, force or numbers. We shall consider the phrase overwhelming preponderance, not as an oxymoron, but something greater than a mere preponderance and something that perhaps is closer to clear and convincing evidence, another phrase in the w.c. law, § 1221(1)(c). We considered this phrase in Green v. ConAgra Broiler Co., 26,599 (La.App. 2d Cir. 3/1/95), 651 So.2d 335, 342.
To meet the standard of clear and convincing evidence in § 1221(1)(c), a trier of fact's belief in a claimant's self-serving testimony alone is insufficient. Expert testimony of an objective quality that focuses on probabilities is additionally required to meet that standard. Clear and convincing evidence is something less than evidence beyond a reasonable doubt. See authorities and discussion in Green, supra.
In accord with the ordinary sense of the word overwhelm, we conclude evidence which overwhelmingly preponderates is that evidence, if found credible and objectively supported by the trier of fact, which either is much more probable than, is greatly superior to, or greatly overcomes the evidence to the contrary. Other evidentiary principles, such as positive or affirmative evidence being superior to negative evidence, should also guide the analysis. Davis-Delcambre Motors, Inc. v. Simon, 246 La. 105, 163 So.2d 553 (1964); LeBlanc v. Cordaro, 378 So.2d 1027 (La. App.2d Cir.1979).
Dr. Burt, Dr. Pressly and Dr. Milstead had seen other patients with work-related CTS or tardy ulnar palsy and were familiar with medical literature consistent with their respective experiences with patients. Work activities cause these afflictions. Drs. Burt and Pressly broadly agreed with Dr. Milstead's opinion that the tardy ulnar nerve palsy and the thoracic outlet syndrome may be classified as occupational diseases along with the statutorily listed CTS. Both Dr. Burt and Dr. Pressly deferred to Dr. Milstead as to whether Ms. Dibler's particular afflictions were caused by her work activities. Dr. Milstead was firm in his opinion. We therefore find no merit in the employer's contentions that only the CTS may be an occupational disease and that none of the three afflictions were caused by Ms. Dibler's work activities.
The WCHO correctly noted and applied the burden of proof statutorily imposed on Ms. Dibler. We adopt and append the findings of fact in the WCHO's reasons for judgment, which are supported by the record and are not clearly wrong. The three afflictions were work related. Ms. Dibler met her statutory burden of proving by an overwhelming preponderance of evidence (especially including expert evidence that can be found to be of an objective quality and highly probable) that her work activities caused the three afflictions.

DECREE
At appellant's cost, the judgment is
AFFIRMED.
BROWN, J., dissents with reasons.

Appendix

State of Louisiana

Department of Labor Office of Workers' Compensation

Malisa Dibler

v.

HIGHLAND CLINIC

DOCKET NO. 92-02842.

June 10, 1994.

REASONS FOR JUDGMENT
This matter came before the court on trial on the merits. Claimant, Malisa Dibler, asserts *593 that she suffered from an accident and/or occupational disease while performing services for Highland Clinic and has been totally and permanently disabled as a result of the accident and/or occupational disease. She contends she is entitled to workers' compensation benefits indemnity and medical benefits from Highland as a result thereof.
By contrast, Highland Clinic asserts that Dibler did not develop an occupational disease from performing services at Highland. Highlands position is as follows: (1) claimant did not develop carpel tunnel syndrome from performing services as Highland; (2) neither tardy ulnar palsy nor thoracic outlet syndrome are occupational diseases; (3) Dibler did not develop tardy ulnar palsy from performing services at Highland; (4) Dibler did not develop thoracic outlet syndrome from performing services at Highland; and (5) if Dibler developed any occupational disease while performing services at Highland, then she cannot discharge her burden of proving by an overwhelming preponderance of the evidence (La.R.S. 23:1031.1(D)) that the occupational disease was caused by performing services at Highland.
The parties entered into the following stipulations at trial which was filed into the record of this case as Exhibit Joint 1:

Joint Stipulation of Facts
It is agreed between Malisa G. Dibler ("Dibler") and Highland Clinic, A Professional Medical Corporation ("Highland"), through their undersigned counsel, that the following facts are deemed proven without the necessity of any evidence being offered to substantiate those facts:
1. Dibler began work at Highland on June 11, 1990.
2. Dibler was assigned to assist Dr. James F. Batte, an oral surgeon.
3. Dibler was a full-time employee.
4. On August 16, 1990 Dibler reported (first claim) that she had received personal injury by accident while working at Highland, and an Employer's Report of Occupational Injury or Disease dated August 16, 1990 was prepared by Highland and is identified as Highland Exhibit 1.
5. Highland is self-insured for workers' compensation liability, and its self-insured fund was Louisiana Retailers Association Self Insurers Fund.
6. On August 16, 1990, Dibler was being paid on an hourly basis, and she was earning $7.00 per hour.
7. Dibler stopped working at Highland on August 22, 1990.
8. Dibler had surgery performed by Dr. Marion E. Milstead on her right wrist on August 23, 1990.
9. Dibler did not work at Highland until September 10, 1990.
10. Dibler returned to Highland and worked on September 10, 1990 and September 11, 1990, but then Dibler did not return to work until September 24, 1990.
11. The first claim was denied by Louisiana Retailers, and Dibler was notified of the denial of the claim in a letter to her dated August 29, 1990 which is identified as Highland Exhibit 2.
12. Dibler returned to work at Highland on September 24, 1990, but she did not work for Dr. Batte.
13. Dibler worked at Highland from September 24, 1990 through August 6, 1991 as a float nurse, working for several different doctors, including but not limited to Drs. Billy W. Hillman, Jr., Paul G. Crawford, David Cooksey, Roy L. Flenniken, J. William Parker and C.D. Knight, Jr.
14. Dibler stopped working at Highland on August 6, 1991, and has not returned to work at Highland since then.
15. Dibler had surgery on her right elbow performed by Dr. Lewis Jones on August 7, 1991.
16. On November 21, 1991, Dibler reported (second claim) that she had received personal injury by accident while working at Highland, and Dibler prepared an Employer's Report of Occupational Injury and Disease dated November 21, 1991 which is identified as Highland Exhibit 3.
*594 17. Dibler had a second surgery on her right elbow performed by Dr. Marion E. Milstead on January 17, 1992.
18. Neither Highland nor Louisiana Retailers has paid any workers' compensation indemnity benefits or medical expenses to, for or on behalf of Dibler as a result of her alleged personal injury or injuries received while working at Highland.
19. The four weeks prior to August 6, 1991, Dibler worked the following number of hours:

 REGULAR OVERTIME
 HOURS HOURS
a. Period ending
 July 12, 1991 40
b. Period ending
 July 19, 1991 40
c. Period ending
 July 26, 1991 40
d. Period ending
 August 2, 1991 40
 ___
 TOTAL 160

20. A Petition (Form 1008) was filed by Dibler on or about March 27, 1992.
21. Dr. Burt examined Dibler on August 1, 1990 and August 15, 1990; and Dr. Burt charged $85.00 for his services.
22. Dr. Milstead/Jones' total charges is $5,114.24, and of those Louisiana Pest Control Association has paid $2,154.00 and Principal Mutual Life Insurance Company has paid $336.00.
23. Dr. Milstead referred Dibler to be examined by Dr. Joe A. Morgan on December 16, 1991; and Dr. Morgan examined Dibler and rendered a report dated December 16, 1991; and further Dr. Morgan charged $72.00 for his services.
24. Dr. Milstead referred Dibler to Dr. Thomas A. Pressly, and Dr. Pressly examined Dibler on October 9, 1991, October 17, 1991 and October 31, 1991; and Dr. Pressly charged $395.00 for his services, and Principal Mutual Life has paid $197.40 and Dibler has paid $79.00.
25. Dibler had day surgery on three occasions at Willis-Knighton Medical Center, and the charges for those surgeries were as follows:

 A. August 23, 1990 $1,960.20
 B. August 7, 1991 2,747.20
 C. January 15, 1992 3,096.60

26. Tri-State Physical Therapy performed services for Dibler at the request of Dr. Milstead; and Tri-State Physical Therapy charged $890.92 for its services.
Dibler's case is governed by LSA-R.S. 23:1031.1(D) since she only worked for Highland Clinic initially from June 11, 1990 to August 22, 1990, which is less than the twelve months regarding the presumption provided for pursuant to the statute. It should be noted that claimant was off for vacation from June 25, 1990, to July 5, 1990.
Accordingly, the burden of proof is on Dibler to prove by an overwhelming preponderance of evidence, that her carpel tunnel syndrome was contracted or manifested itself during the course and scope of her employment at Highland.
Essentially, Dibler's testimony at trial was that when she returned to work after her planned vacation, she began experiencing problems with her right hand around the middle of July, 1990. She was seen by Dr. Don Burt, an orthopedic surgeon, on August 1, 1990.

Treatment by Dr. Don Burt
According to Dr. Burt's reports and his deposition testimony, it was his general impression that Dibler had carpel tunnel syndrome on the right.
When Dr. Burt was given a summary of Dibler's testimony as to her work history at Highland along with the onset of her symptoms for purposes of the deposition, Dr. Burt stated via deposition that "it could be possible that she could get it (meaning carpel tunnel syndrome) within a ten-day period."
Dr. Burt opined that he is aware of cases in which tardy ulnar palsy is related to work activities. In those instances the condition was as a result of trauma and not repetitive motion. Dr. Burt also opined that, in his experience with carpel tunnel syndrome, he has seen cases in which carpel tunnel syndrome develops immediately when there is a traumatic injury. Yet in carpel tunnel syndrome cases not caused by trauma, he has *595 recalled an instance wherein an automobile worker handling some extremely strong tongs developed severe carpel tunnel syndrome in a period of 24 hours from repetitive motion. (Plaintiff Exhibit 7)
Dr. Burt treated Dibler on two occasions. He saw her first on August 1, 1990. His notes reflect Dibler reported she had complaints about her right hand"problems times two weeks ago." (Plaintiff's Highland 12, page 9, lines 12-15) Dr. Burt stated he assumed Dibler was a typist. Upon being told that she was a dental assistant, Dr. Burt noted that that was one of the occupations that will cause carpel tunnel syndrome. Dr. Burt stated that whether a dental assistant who worked for an oral surgeon as opposed to a dentist would be similarly situated depended upon the actual type of work or particular activity performed.
He stated that he could not be sure "one way or the other" whether Dibler's carpel tunnel syndrome developed because of her work as an oral surgeon's assistant at Highland. He also testified that he did not find that Dibler had tardy ulnar palsy. He deferred to claimant's treating physician as to the diagnosis, causation and other aspects of the tardy ulnar palsy. When Dr. Burt say Dibler on August 15, 1990 he noted she still complained of some pain. He advised her to decrease her work activity. He stated that at the time he thought she was a typist. He testified that he did not give his opinion that her condition was due to work activity. Rather he stated that he did not write the note himself. He stated Dibler requested the note which he signed. (See note dated August 15, 1990, Highland # 12).

Treatment by Dr. Marion Milstead
Dr. Marion Milstead, an orthopedic surgeon, first saw Dibler on August 17, 1990. She complained of pain in her right forearm and hand radius up into the elbow and in the shoulder. He diagnosed her as having carpel tunnel syndrome, tardy ulnar palsy and thoracic outlet syndrome.
Dr. Milstead performed the carpal tunnel release surgery on August 23, 1990. He stated that as of the August 17, 1990 visit, he felt Dibler could not go back to her previous employment. He stated that "with the carpel tunnel syndrome and tardy ulnar palsy being related to the repetitive motion that I felt she was doing, the fact she already had the enervation, I thought she needed the surgery and she did not need to return to work and increase the symptoms more that she already had." Dr. Milstead indicated that he did not perform tardy ulnar palsy surgery at the same time because of the EMG reports. He wanted to treat her conservatively.
When Dr. Milstead subsequently saw Dibler on September 4, 1990 he noted her pain had "slightly been getting better. He stated she still had complaints of pain and intermittent numbness in the forth and fifth fingers. Dr. Milstead stated that these complaints were related to the ulnar nerve problem. He also noted positive findings at the elbow of the Tinel's, which is indication of neuritis of the nerve ..." (See Dibler 1, page 17, lines 4-17)
When Dr. Milstead saw Dibler on September 12, 1990 with "increased pain", he instructed her not to return to work at that time. He recommended movement exercises for her fingers and thumb.
As of January 29, 1991, Dibler began formal physical therapy. He said formal therapy is recommended when the patient is not showing the response he wants.
Dr. Milstead noted he released Dibler to return to light duty work in October, 1990.
As of October 24, 1990, Dr. Milstead diagnosed claimant as having Dupuytren's disease. (Dupuytren's disease is a condition involving formation of scar tissue.) On December 19, 1990 Dr. Milstead opined that Dibler's carpel tunnel problem was essentially asymptomatic. He noted all of the positive symptoms were from the ulnar nerve. At that time the ulnar nerve problem was getting worse.
According to Dr. Milstead, the carpal tunnel and tardy ulnar palsy are both occupationally related, but "it can also be aggravated or cause problems in day to day living. Once it starts, whatever starts it off, hurting, *596 just doing routine activity can keep it aggravated. So I felt it was just continued progression of the problems she had had before." (See Dibler 1, page 22, lines 3-9)
Dr. Milstead also opined "one thing, and this does happen, there is no scientific study that I know of that supports it, but we see this in a lot of multi-fracture patients. When you start treating one of the major problems and they get better they begin to notice other things showing up." So, the only thing I can say is that the carpal tunnel has gotten better. If the whole hand is numb you can't really tell, but as this begins to improve then this seems to be getting worse. It's either really worse or it's about the same, but it's more symptomatic because the other is improving. (See Dibler 1, page 22, lines 10-21)
As per Dibler's job duties, Dr. Milstead stated that claimant was a dental assistant. He noted the job duties entailed keeping the wrists in a flexed position and moving elbows back and forth. He stated elbow hyperfexiation and propping of the elbow create problems with tardy ulnar palsy.
Dr. Milstead followed Dibler again after the surgery by Dr. Jones. As of August of 1991, he did not think she could return to work. Dr. Milstead noted that in September 1991, Dibler still complained of tingling in the fourth and fifth fingers and burning from the incision down into her arm and hand. He attributed those complaints to neuritis and nerve inflammation and "the possibility of scarring around the nerve post-op because of the Dupuytren."
After repeated nerve conduction studies and continued complaints of "pain, paresthesia and persistent ulnar nerve neuritis", Dr. Milstead did not recommend another surgery at that time. He referred her to Dr. Joe Morgan, an orthopedic surgeon, for a second opinion.
On January 17, 1992, a second surgery was performed on the ulnar nerve. Her post-op symptoms continued. As of May 11, 1992, Dibler experienced marked increase in pain and had cramping in the arm and wrist. She complained of loss of grip strength and increased pain in the elbow. She was given a removable brace then a cast for a month and a half.
On November 17, 1992, the case was removed. Dr. Milstead was of the opinion the Dibler could not go back to the same type of work she was doing. He opined that anything that required repetitive elbow extension or keeping the elbow flexed in a stiff position for a long period of time would continue to aggravate the problem. (See Dibler 1, page 32, lines 12-20) Dr. Milstead did not recommend further surgery primarily because of Dibler's problem with scarring.
Dr. Milstead referred Dibler to Dr. Thomas Pressly, an internal medicine doctor with a specialty in rheumatology, for what he suspected was a fibromyalgia type condition. According to Dr. Milstead, particularly carpel tunnel syndrome, tardy ulnar palsy and thoracic syndrome, can all occur within a short period of time. He also opined that the shortest period of time he has seen for onset of carpel tunnel syndrome is two months after a sudden change or alteration in activity level.
As for Dibler's work switch or change, Dr. Milstead stated the work for the oral surgeon precipitated the trio of problems. "That's supported by the fact that even when I first saw her she clinically had the problem but the EMG's didn't become positive a while after that. So it can be a progressive thing that was tipped over the edge or exacerbated or aggravated by this sudden change in activity she was performing, yes, sir."
He indicated that the repetition and fine motor precision are all work activities that can cause carpel tunnel syndrome. (See Dibler 1, page 56, lines 1-17) Dr. Milstead also noted that essentially these activities were common in the job of dental assistants no matter what specialty or area in which they worked in.
Dr. Milstead further stated that he based his opinion on the conditions as being occupationally related primarily on the fact that Dibler was asymptomatic before she worked at Highland Clinic and she became symptomatic after she began working at Highland.
He opined that the three conditions Dibler hadcarpal tunnel syndrome, tardy ulnar *597 nerve and thoracic outlet syndromewere job-related and the Highland job was the precipitating factor. (See Dibler 1, page 89, lines 22-25 and page 90, lines 11-13) The court gives great weight to the opinions of Dibler's primary treating physician. Further, the other doctors deferred to Dr. Milstead's opinion as to causation and work-relatedness of Dibler's maladies.

Treatment by Dr. Lewis Jones
Dr. Lewis Jones, an orthopedic surgeon and a partner at Orthopedic Specialists of Louisiana, saw Dibler while Dr. Marion Milstead was away. Dr. Jones performed tardy ulnar nerve surgery on Dibler on the right. He saw Dibler about four times between August 1, 1991, and September 12, 1991. Dr. Jones stated he took a very limited history from Dibler and treated her for complaints of pain.
According to Dr. Jones the most common cause of tardy ulnar palsy is "unknown". He stated that he could not give an opinion about the connection between the tardy ulnar palsy and Dibler's alleged disability one way or the other. He deferred to Dr. Milstead as to the causation determination. He did indicate that he knew of tardy ulnar neuropathy being related to trauma.

Evaluation by Dr. Joe Morgan
Dr. Milstead referred Dibler to Dr. Joe Morgan, an orthopedic surgeon, for a second opinion. In his letter dated December 16, 1991 of her visit of the same date, Dr. Morgan stated he believed "she has a problem with the right elbow and with the right wrist. He opined "that she still has ulnar nerve compression of the right elbow coming from two places that being the one of the ligament of strother's in the lower arm and at the area of penetration into the flexor mass in the upper forearm. I would recommend that you re-explain the area and enlarge the incision both proximally and distally, and make sure that the nerve is free completely. I believe that procedure would probably stand a chance of improving her."
Dr. Morgan further stated that "regarding Dibler's wrist, she appears to have pain coming from possibly three areas that being the pisiform triquetra joint, the basilar joint of the thumb and the region of the ulnar tunnel. She can't take Cortisone, so we are limited inability to help give us more information about the two joints, with regard to the ulnar tunnel this may represent a double crush phenomenon in relationship to the elbow or it may be of very little consequence. What I have done in the past when I have seen the problem at the elbow and at the wrist together, is surgically release the ulnar tunnel as well. That's an opinion for you or you may want to just leave it alone and deal with that after the elbow is done." (See Jones depo # 4 and Milstead # 4)

Evaluation and Treatment by Dr. Thomas Pressly
Dr. Thomas Pressly, an internal medicine doctor with a specialty in rheumatology, saw Dibler on a referral from Dr. Milstead. He initially saw her on October 7, 1991. He took a history of status "post ulnar nerve entrapment release who presents for evaluation with complaints of continued pain and inflammation. He noted "the patient stated that two years ago prior to this visit, showed an onset of right hand paresthesia, more in the morning, which mainly involved the first through third fingers. (See Highland 10, page 17, lines 19-25 and page 18, lines 1-3)
Dibler presented to Dr. Pressly with persistent medical elbow pain at the time. He also noted a positive Tinel's over the right elbow. He indicated that Dibler's nerve irritation was indication of fibromyalgia. He found no arthritis, but did find arthralgia (pain in the joints). Dr. Pressly found Dibler had back pain and elbow pain. He recommended motion exercises, counseling and antidepressants to improve her sleep cycles. He felt she had a chronic pain condition. He saw Dibler on October 7, 1991 and October 9, 1991, for chronic pain. She had cramping in the right palm. Dr. Pressly and continued to have ulnar nerve entrapment. His assessment on October 17, 1991 was that she had ulnar nerve entrapment with increased symptoms. He adjusted her medication. He *598 also encouraged her to use her right hand more. After he saw her on October 31, 1991 he did not see Dibler again until February 1993.
Dr. Pressly opined that it would be "very unlikely, very remote" that Dibler developed carpel tunnel syndrome from assisting Dr. Batte from June 11, 1990 to August 1, 1991. He stated that Dibler could have had a pre-existing condition that was aggravated, but that he would be skeptical of the short work activity causing the CTS. He also deferred to Dr. Milstead as per the causation.

Examination by Dr. Craig Springmeyer
Dr. Craig Springmeyer, an orthopedic surgeon, saw Dibler on October 16, 1992 for medical examination. In his note of the same date, Dr. Springmeyer indicated claimant's status was post carpel tunnel release by Dr. Milstead. He also noted the ulnar nerve transposition subcutaneous by Dr. Jones and neurolysis of the ulnar nerve by Dr. Milstead.
Dr. Springmeyer noted Dibler was "still having problems with her elbow with some continued pain and is presently immobilized in a long arm cast from the wrist up to the elbow region."
Dr. Springmeyer noted Dibler's recent medical history and treatment and concluded that "it appears that she had clinical evidence of cubital tunnel syndrome and carpel tunnel syndrome 1990. It appeared that her repetitive motion aggravated her cubital tunnel syndrome in the right elbow necessitating her second surgery."
In essence, the substance of the lay testimony regarding the actual job duties of Dibler for the relevant periods was generally corroborative of her testimony at trial. The lay testimony as to claimant's complaints of pain and limitations of activities were consistent with claimant's testimony.
Based on the totality of the evidence presented in this case, it is the finding of the court that the carpel tunnel syndrome, ulnar nerve palsy and to a much lesser extent the thoracic outlet syndrome are compensable occupational diseases for this claimant. Dibler met her heightened burden of proof in this case.
The court gives great weight to the opinions of Dr. Milstead, Dibler's primary treating physician. And although he was not exactly sure of what exactly a dental assistant for a dentist versus an oral surgeon it made little difference in his overall opinion. He also successfully and convincingly ties in the causal relationship between the triple medical problems and the work-relatedness of same with respect to Dibler's employment with Highland. Dr. Milstead certainly shed the proverbial light on the subject of the problems with repetitive motion, fine precision skills and the short time factor with a change of job activities can have in cases such as these. Dr. Milstead opined that dental assistant is one of the occupations which lends itself to carpel tunnel syndrome and ulnar nerve palsy.
In order to recover benefits for an occupational disease, the employee must prove that he/she contracted the disease in the course of his/her employment and that the disease was the result of the nature of the work performed. Page v. Prestressed Concrete Company, 399 So.2d 657 (La.App. 1st Cir.1981), writ not considered, 401 So.2d 994 (La.1981).
In the instant case the court finds that the occupational diseases Dibler suffered from and conditions that are characteristic of and peculiar to Dibler's occupation.
Here, Dr. Milstead's testimony and reports showed the court of the work-relatedness of the carpel tunnel syndrome, the tardy ulnar palsy and thoracic outlet syndrome per Dibler's employment with Highland.
The court finds Dibler is entitled to temporary total disability benefits for the following periods: August 17, 1990, until September 24, 1990, and from August 7, 1991, until November 22, 1992. She is entitled to supplemental earnings benefits from November 23, 1992. Claimant is also entitled to payment for medical treatment including but not exclusively by Dr. Don Burt, Dr. Marion Milstead, Dr. Lewis Jones, Dr. Joe Morgan, Dr. Thomas Pressly, Willis Knighton Medical Center, and Tri-State Physical Therapy.
*599 No penalties are assessed, as the court found that defendant reasonably controverted all claims and its actions were not arbitrary, capricious and without probable cause.
THUS DONE AND SIGNED this 10th day of JUNE, 1994.
 /s/ Ramona L. Emanuel
 RAMONA L. EMANUEL
 JUDGE
 OFFICE OF WORKERS'
 COMPENSATION
 DISTRICT 1W
BROWN, Judge, dissenting.
Dibler's employment with Highland Clinic began on June 11, 1990. She worked as an assistant to Dr. James Batte, an oral surgeon, for only eleven days before going on a two week family vacation. (Emphasis added). Upon her return on July 5, 1990, she worked as Dr. Batte's assistant until August 22, 1990.
Dibler's duties as an oral surgeon's assistant included some repetitive motions with her right arm during surgeries. Dibler testified that she assisted in an average of less than four surgeries, approximately fifteen to thirty minutes each, per day. The remainder of her work day was spent cleaning instruments, developing x-rays, talking to and caring for patients and performing administrative duties.
On August 1, 1990, Dibler consulted Dr. Don Burt, an orthopedic surgeon. Dibler told Dr. Burt that she had been experiencing pain and tingling in her right hand for approximately two weeks. Dr. Burt saw Dibler again on August 15, 1990. Based upon the history related to him by Dibler, Dr. Burt concluded that Dibler was suffering from work-related carpal tunnel syndrome. Dr. Burt testified that he assumed (albeit erroneously) that Dibler performed secretarial work involving a lot of typing. He further stated that he had no basis for his statement in a medical report that Dibler's carpal tunnel syndrome was caused by her employment except for what Dibler herself told him. In his deposition, Dr. Burt stated that he did not have sufficient information to determine the cause of Dibler's carpal tunnel syndrome, nor would he opine as to the cause of her tardy ulnar palsy. (Emphasis added).
Dibler was examined by another orthopedic surgeon, Dr. Marion Milstead, on August 17, 1990. Dr. Milstead diagnosed Dibler's condition as carpal tunnel syndrome and tardy ulnar palsy. Based upon the fact that Dibler's symptoms manifested while she was working at Highland Clinic, Dr. Milstead opined that both conditions were caused by her employment; however, Dr. Milstead made no inquiry into Dibler's work history, nor did he determine the short length of time that she had been employed at Highland Clinic. Furthermore, Dr. Milstead did not know the nature of Dibler's job at Highland Clinic. (Emphasis added). Instead, the record indicates that Dr. Milstead assumed that Dibler was a dental assistant.[1]
In October 1991, Dr. Milstead referred Dibler to Dr. Thomas Pressly, a rheumatologist, who opined that carpal tunnel syndrome could not develop over a short period of time as that worked by Dibler. According to Dr. Pressly, it was unlikely that Dibler's condition was caused by her work at Highland Clinic. Dr. Pressly further stated that it was very difficult to determine the cause of tardy ulnar palsy and that he doubted that Dibler's condition was job-related.
Dr. Lewis Jones, Dr. Milstead's partner, also treated and performed surgery on Dibler. When asked his opinion regarding causation, Dr. Jones deferred to Dr. Milstead's opinion. Dr. Jones stated that he did not consider tardy ulnar palsy to be an occupational disease in the absence of some specific trauma. He further offered that he had never seen a case of tardy ulnar palsy that was caused by a person's employment.
The hearing officer's determination that Dibler's carpal tunnel syndrome, tardy ulnar nerve palsy and thoracic outlet syndrome were caused by her employment with High-land *600 Clinic was based solely upon the testimony of Dr. Milstead. As noted above, Dr. Milstead did not inquire into Dibler's previous employment history, nor was he aware of the extremely short period of time that Dibler had worked at Highland Clinic.[2] Additionally, Dr. Milstead mistakenly believed that Dibler worked as a dental assistant at Highland Clinic, rather than as an oral surgeon's assistant and licensed practical nurse.
In a few days after she began working at Highland, the symptoms of Dibler's condition became apparent; thus, her problems are presumed to be non-occupational (LSA-R.S. 23:1031.1(D)). An overwhelming preponderance of the evidence is necessary to overcome this presumption. Such overwhelming evidence is not present in this case.
I respectfully dissent.
NOTES
[1] According to Dr. Batte, who is a dentist in addition to being an oral surgeon, a dental assistant's work is much more intense because dental procedures require more time than do oral surgeries and are performed on an eight hour a day basis.
[2] Prior to her employment with Highland Clinic, Malisa Dibler's work history is as follows:

1978-1980: full-time dental assistant
1980-Feb. 1984: full-time wife/mother
Feb.-Sept. 1984: full-time kindergarten
 teacher
Feb. 1985-April 1986: full-time dental assistant
April-Sept. 1986: full-time pest control
 technician
Nov. 1986-May 1987: full-time receptionist
June 1987-Aug. 1988: full-time nursing student