JaSHORTESS, Judge.
This appeal requires us to decide whether Frances W. Maurer (plaintiff) is entitled to receive additional supplemental earnings benefits (SEB) from her employer, Dillard Department Stores, Inc. (defendant), in Hammond, Louisiana. The workers’ compensation hearing officer awarded plaintiff SEB because he found plaintiff had proved her injury caused her to earn less than 90% of her pre-injury salary. Defendant appealed.
Plaintiff was a salesperson for defendant earning $8.80 per hour. She serviced customers, folded clothing, and stocked merchandise. On February 16, 1995, she walked into the stock room to “clock-in” when overhead boxes filled with merchandise fell on her head, knocking her down. She testified that when she got up, she felt a “burning sensation” in her head, had a “terrible headache,” and experienced lower back pain. She did not leave the store immediately but left later because she had an intense headache and was having difficulty concentrating on her job.
A local hospital x-rayed her neck and shoulders and gave her medication for her pain. The tests did not reveal any visible acute trauma to her neck or back. Plaintiff returned home, where she stayed a few days. She sought other medical treatment and tried chiropractic therapy to help relieve her pain symptoms. But feeling no improvement, she was referred to Dr. Pervez Mussa-rat, a neurologist. Thereafter, Mussarat was plaintiffs primary physician. He saw her in April 1995 and ordered a cervical spine magnetic resonance image (MRI). Mussarat’s initial examination and the MRI did not reveal any acute neck or back abnormalities, but his primary impressions were that plaintiff had minimal radiculopathy of a degenera-tional origin at the L5 and C5 areas, and he prescribed pain medication.
When plaintiff did return to work, she worked part-time, four hours daily. In August 1995, Mussarat allowed plaintiff to resume a full-time work schedule but with a light-duty, no-heavy-lifting restriction. Plaintiff asked to return to her sales position and defendant accommodated her by assigning her to a low-volume sales area. Plaintiff received weekly temporary total disability benefits and medical expenses Igwhile not working. She also received SEB.[1] Once working full-time again at her former position, plaintiff no longer received compensation benefits.
But by November 1995, plaintiff took a new position in defendant’s customer service department. Plaintiff was earning $5.50 per hour at the time of the hearing. She said she left the sales position because she no longer could perform at her same pre-injury level. She said her head and neck pain, caused by the injury, along with the need to take pain medication, limited her effectiveness as a salesperson and the “stress” made her change positions. She filed a claim for SEB because she claimed the injury forced her to change positions and the new customer-service position pays less than her pre-injury sales position. Defendant denied her claim because, after reviewing Mussa-rat’s medical records, it believed that by November 1995 the pressure of sales caused plaintiff to change positions, rather than any alleged debilitating pain caused by the accident.
The hearing officer ruled in favor of plaintiff based on her testimony she had voluntarily changed positions and would have remained in the sales position but for her pain. He believed the accident caused her pain and therefore, because she is now earning less money, she is entitled to SEB.
*1292 The purpose of SEB is to compensate an injured employee for a reduced wage earning capacity because of a work-related accident.[2] Like all other provisions of the workers’ compensation laws, a court should liberally construe SEB provisions in favor of coverage.[3] These provisions are contained in Louisiana Revised Statute 23:1221(3)(a)-(f), and section (a) provides that an employee should recover SEB if a work-related accident, and resulting injury, hinders an employee’s ability to earn wages equal to at least 90% of the employee’s pre-injury wages.[4] This employee |4must prove by a preponderance of the evidence that his work-related injury produced a partial disability rendering him unable to earn 90% of his pre-injury wages.[5] If successful, the employee establishes a prima facie case for entitlement to SEB and the burden of proof shifts to the employer to show the employee is physically capable of work.[6] Alternatively, if the employee alleges substantial physical pain prevents him from performing work offered or available paying at least 90% of his pre-injury wages, the employee must prove this under the clear-and-convincing-evidence standard, unaided by any presumption of disability, before he can recover SEB.[7]

Did plaintiffs work-related injury create a partial physical disability preventing her from earning wages equal to at least 90% of her pre-injury wages ?

Mussarat never stated plaintiff was partially physically disabled after she was released for full duty. Moreover, not only was plaintiff physically capable of working as a salesperson, but she, in fact, returned to the same position earning a higher salary and performing the same functions. Plaintiff also does not allege a disability other than one caused by pain. Therefore, we concentrate on that issue.
Did plaintiff prove the accident caused her substantial pain preventing her from working as a salesperson?[8]
Plaintiff argues she is entitled to SEB because she is unable to perform her former job duties without pain and she cannot earn at least 90% of her pre-injury wages at her new customer service position.
She must prove her case under the clear- and-convincing-evidence standard.[9] The record shows the hearing officer placed great weight on plaintiffs testimony. She testified that after the accident, she had intense headaches and radiating pain in her neck, shoulders, and arms. She said she had to take pain medication prescribed by Mussarat to function effectively. She was worried the medication would impair her ability to work, specifically the ability to meet her sales quota. She related an experience during the Christmas holiday season where she was required to assemble artificial trees. She said she had constant pain in her arms and shoulders while she assembled the trees.
|sShe also complained about standing for the entire time she worked the sales floor. She told the hearing officer she enjoyed sales and wished she could stay in that area, but her head, neck, and shoulder pain, allegedly caused by the injury, along with her need to take pain medication, impaired her ability to *1293 cope with the stresses of sales. This is why, according to plaintiff, she was forced to accept a new position earning less than her former sales position. She can sit and does not need to take pain medication working in the customer service department.
Mussarat knew plaintiff had been complaining of pain. He noted the April MRI detected a moderate old compression of the L5 back area and degenerative changes in other areas, which he speculated at that time, the accident could have aggravated. He later wrote in his December 12 progress report, “I think that given the patient’s condition of stress and more pain and stiffness in her back region while standing on her feet, it may be a good idea to provide her with a position that she can sit down to perform.”
But, the record also contains many entries by Mussarat that east doubt on whether plaintiffs pain was 1) solely related to her February accident, and 2) substantial enough to entitle her to SEB. For example, Mussarat evaluated plaintiff on June 26,1995, and stated in his report that plaintiff continued to complain of pain and numbness and heaviness in her left arm but her neurological exam was normal and her reflexes good. He further stated, “I have a feeling that she is exacerbating [sic][10] her symptoms and I see no hard pathology in the C-spine causing her continuous discomfort.” The April MRI did not detect a hernia or any other significant abnormality. Mussarat’s August 15, 1995, report included the notation: “[Plaintiff] does have minor element of C-5 root irritability on the left side of the EMG studies, but her MRI was not very convincing.” He opined she had reached maximum improvement.
He noted in his August 17,1995, report, “I think she is trying to exacerbate [sic] her symptoms and I have said this again and again.... On 8/15/95 again I thought that she does not have any good evidence of her problem ... [and] her MRI |6was normal suggesting that she should respond to conservative treatment for whatever pathology in her neck.” On August 21, 1995, Mussarat completed defendant’s Return to Work Medical Certification form and certified plaintiff was able to resume performing the essential functions of her position, except that she should not lift any objects heavier than fifteen to twenty pounds.
He noted in a later report her problems seemed to emanate from the stress and anxiety from sales and wrote, “She worries about losing her job and she worries about not doing as good as she is expected to do.” Mussarat also recommended defendant offer her another position where she could sit more. On October 27, 1995, Mussarat found plaintiffs anxiety and stress were much worse and recommended she rest for ten days. Two Return to Work Medical Certification forms, signed by Mussarat and plaintiff on November 2 and 3, echo Mussarat’s opinion that plaintiffs problems were related to the stress of her sales position. The November 2 form’s comments show Mussa-rat released plaintiff to work without imposing any physical limitations on her.
Defendant wrote to Mussarat after it received the November Return to Work Medical Certification forms. It asked whether his recommendation that it offer plaintiff a position where she could sit more was because of her injury, or rather from the stress of the sales position. Defendant informed Mussa-rat plaintiff complained of stress in about every position it had placed her. Based on the lack of objective findings up to that time, defendant asked whether her sprain/strain type of injury had resolved. Since “it is a proven medical fact that stress can cause headaches, neck and shoulder soreness, among other things, couldn’t it be that [her injury] has resolved and the problems she is experiencing now are simply a result of ‘tension’ and ‘stress’?” asked defendant.
On December 1, 1995, Mussarat evaluated plaintiff for the last time. He continued to believe plaintiffs anxiety over sales was the main cause of her symptoms and wrote:
Again, there are no objective neurological-findings. I have stated again and again that I find no objective findings with this patient and her symptoms are stress relat *1294 ed. She describes stress as working on the floor and coping with demands of making a quota.... I have said previously that this stress has nothing to do with her neck and I find no objective evidence of neck injury causing constant com/plaints of neck pain.
l7(Emphasis added.)
Plaintiff complained of intense headaches, but admitted to experiencing sinus and tension headaches before the accident. She testified the post-accident headaches were different in nature as compared to her pre-injury headaches but did not offer any objective evidence in support of this contention. And though plaintiff claims her pain was not solely caused by stress, part of plaintiffs testimony supports Mussarat's theory. Plaintiff said,
A sales — all sales associates is. I mean, their store’s literally a battlefield, you know, it’s — because everybody’s out there trying to meet their sales quota. And you’re constantly dealing with employees saying, she stole my sale or — I mean, this is — this is not just with them but just with the whole....
[[Image here]]
[A]nd so I was afraid — .if you don’t make that sales quota, they terminate you. And if you — so this is why I was — I said for my health reasons I will take a cut in pay.
When we consider the whole record, we are convinced the hearing officer legally erred in finding plaintiff had shown by clear and convincing evidence that substantial pain resulted from the accident, keeping her from returning to her sales associate position and entitling her to SEB. Mussarat’s reports, equivocal and contradictory in parts, were given little, if any, weight by the hearing officer, whose oral reasons state:
Based on her testimony and what I’ve heard and what evidence I’ve seen or heard about. And I have heard that Dr. Mussarat doesn’t think that she still has any neck or head problems....
Plaintiffs testimony alone is not enough to overcome the hurdle of the clear- and-convincing standard. As the Dibler v. Highland Clinic[11] court stated in a similar workers’ compensation case for SEB: “To meet the standard of clear and convincing evidence in § 1221(l)(c), a trier of fact’s belief in a claimant’s self-serving testimony alone is insufficient.” The hearing officer here awarded plaintiff SEB based on her testimony alone; that is insufficient and legal error. For the reasons stated, we reverse and render judgment dismissing plaintiffs suit at her costs.
REVERSED AND RENDERED.

. The record is not clear on which specific date the payment of benefits ceased.

. Hurst v. Baker Sand Control, 94-2463, p. 4 (La.App. 1st Cir. 10/6/95), 671 So.2d 408, 411.

. Id.

. Revised Statute 23:1221 (3)(a) reads:
For injury resulting in the employee’s inability to earn wages equal to ninety [percent] or more of wages at time of injuiy, supplemental earnings benefits equal to sixty-six and two-thirds percent ■of the difference between the average monthly wages at time of injuiy and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis....

. Id. at 412.

. Id.

. La. R.S. 23:1221 (3)(c)(ii); Hurst, 94-2463 at 6; 671 So.2d at 412.

. See La. R.S. 23:1221 (c)(ii).

. La. R.S. 23:122 l(c)(ii).

. This may be an error. Exacerbate, a verb, according to Webster’s Third New International Dictionary of the English Language, Unabridged 790 (1993), means: “to make more violent or bitter: intensify the bad qualities of.” Perhaps the word should be "exaggerate.”

. 27,274, p. 7-8 (La.App.2d Cir. 9/27/95), 661 So.2d 588, 592.